## HASLER et al. v. WEST INDIA S. S. CO.

(Circuit Court of Appeals, Second Circuit. January 14, 1914. On Motion for Rehearing, February 21, 1914.)

### No. 119.

1. SHIPPING (§ 58*)—CHARTER—ACTION FOR BREACH.

Libelant chartered a steamship to respondent for the carriage of a cargo of sugar to be loaded at one or more ports on the northern side of Cuba; the charter giving respondent the right to cancel, if the vessel was not at the loading port by July 12th. On July 6th she reached Havana with a cargo, and the master told respondent's agent that he would unload both night and day so as to be ready on time, but was told it would be unnecessary, as the cargo was ready and a delay of a day or two would be immaterial. Discharge was finished July 11th, and respondent then ordered the vessel to Neuvitas for loading, which could not be reached in less than two days, and another agent for respondent told the master that it was intended to cancel the charter, if the vessel was not there on time. Libelant refused to send the vessel and brought suit for damages for breach of the charter. *Held* that, while the action of respondent might amount to an equitable estoppel to insist on the time limit of the charter, it was not a breach of the contract, the strict performance of which respondent was insisting on, but that the contract was broken by libelant by refusing to send the vessel to the designated loading port.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 233–244, 314, 327; Dec. Dig. § 58.*]

#### On Motion for Rehearing.

2. CONTRACTS (§ 237*)—PERFORMANCE—WAIVER OF CONDITIONS.

In the absence of conduct creating an estoppel, a waiver of a provision of a contract must be supported by an agreement based on a valuable consideration, and the waiver must have been intended by one party and so understood by the other.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 1119–1122; Dec. Dig. § 237.*]

Appeal from the District Court of the United States for the Southern District of New York.

Suit in admiralty by Frederick E. Hasler and others against the West India Steamship Company. Decree for libelants, and respondent appeals. Reversed.

On June 17, 1910, Hasler, Leitch & Co., chartered owners of the steamship M. C. Holm, entered into a charter party with the West India Steamship Company; the agreement being concluded in New York City. Under this agreement the West India Company agreed to furnish Hasler, Leitch & Co. "a full cargo, under deck, of sugar in bags." Hasler, Leitch & Co. agreed on chartering and freighting the vessel to the West India Steamship Company "for a voyage from one and/or a second safe port on the north side of Cuba to New York, Philadelphia or Boston as ordered on signing bills of lading, one port only to be used for discharging." It was also agreed that: "Lay days, if required, not to commence before July 5, 10—Charterers have privilege of canceling charter should steamer not be at loading port ready for cargo by July 12, 10."

The Holm arrived at Havana on July 6th and completed its discharge on July 11th, about 2 p. m., when it was tendered to the agents of the West India Steamship Company in Havana. The order was then given by the charterers

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

that the vessel should proceed to Nuevitas a port two days' sail from Havana. Hasler, Leitch & Co. refused to send the vessel to Nuevitas for reasons appearing in the opinion and for the purpose of minimizing damages ordered the vessel to Turks Island to take a cargo of salt there available.

Hasler, Leitch & Co. claimed that the action of the West India Steamship Company amounted to a breach of contract. The steamship company denied any breach of contract on its part and asserted that Hasler, Leitch & Co. committed the breach by failing to send the steamer to Nuevitas. A decree was entered in the court·below in favor of Hasler, Leitch & Co. for damages and costs amounting to $2,716.73.

Ralph James M. Bullowa, of New York City (Norman B. Beecher, and Ralph J. M. Bullowa, of New York City, of counsel), for appellant.

Haight, Sandford & Smith, of New York City (Charles S. Haight, of New York City, Advocate), for appellees.

Before LACOMBE, WARD, and ROGERS, Circuit Judges.

ROGERS, Circuit Judge (after stating the facts as above). [1] The question for this court to decide is whether the respondent committed a breach of the charter party and is liable in damages therefore as decreed by the court below. In determining this question it is necessary to apply the ordinary principles of contract law. For a charter party is regarded, after all, as simply an ordinary contract and as such is subject to the same rules that govern ordinary contracts.

Under the terms of the contract in the case at bar the respondent or charterer had the right to load the libelant's vessel with sugar at some one or two of the ports on the north side of Cuba for a voyage to New York, or Philadelphia, or Boston as ordered. The vessel by the express terms of the contract was to be at the loading port ready for cargo by July 12, 1910. It was the duty of the respondent; the charterer, when the vessel was tendered at Havana on July 11th to inform the libelant to which port or ports on the north side of Cuba she should proceed as her loading port. The order was issued that the boat should proceed to Nuevitas. This she did not do, basing her refusal to go upon the conduct of respondent, which, it is claimed, released her from the obligation to proceed to the designated port. It is also alleged that respondent's conduct amounted to a breach of the charter party.

It is our understanding that under a charter party if the ship is not at the loading port its duty is to proceed there with reasonable diligence, and if she fails to arrive by the designated time the charterer may refuse to load her and may also have his action for damages—unless the delay was occasioned by excepted perils. But in the case under consideration the action for damages is not brought by the charterer although the ship made no attempt to reach the designated port. Here the action is brought by the shipowners, and as they did not comply with the terms of their contract and do not claim that they did the circumstances must be somewhat unusual if they can maintain the suit.

It appears that the steamer reached Havana on July 6, 1910, with 3,200 tons of coal and 200 tons of coke on board, and the work of

unloading began at 6 o'clock the next morning. That same day the libelant informed the respondent that they would work nights and would go to any expense necessary to discharge the cargo so as to be ready to load on time as fixed by the charter. The reply was that the respondent did not intend to cancel; that it was not necessary to work overtime and would be a waste of money; and that, as the respondent had a cargo ready, it would not make any difference if the boat was two or three days late. It also appears that, if the libelants had not been misled by the respondent, the vessel could and would have been ready according to the contract. About 500 tons—a ten-hour day—was actually discharged each day, and, when night work was done, fresh gangs of men being used, about the same amount of coal was discharged each night. Because of the representations and assurances of the respondent that there was no intention to cancel and that there was no reason why the libelant should work nights, no night work at unloading was done the first two nights. But later, suspicions having been aroused that the intentions of the respondent were not according to its professions, night shifts were put on and worked all Saturday night and Sunday night, and it was agreed that if night shifts had also worked on the nights of Thursday and Friday the vessel might have cleared on Saturday and conformed in all respects to her contract.

On July 11th, the steamer being unloaded, one of the agents of the respondent, well aware of the representations previously made, came to see the libelant stating that he had "a dirty business to perform," or words to that effect; adding that the respondent had no cargo for the boat, and that if orders were wanted they would be given in writing to proceed to Nuevitas the farthest port to which she could be sent from Havana, and that when she got there "we are going to cancel her." The testimony also showed that the order to go to Nuevitas was given simply because it was known that the vessel finishing her discharge on July 11th could not reach Nuevitas on the 12th.

The libelants claim that, in view of all that took place, the respondent was in fact guilty of a breach of contract and that was the view taken in the court below. The libelants also claim that there was a waiver of the requirement that the libelants tender the steamer at the loading port on or before July 12th.

In all this we do not discover anything which amounts to a breach of contract on the part of the respondent. That there was a breach of the charter party is evident. But it occurred when and because the libelant failed to send the ship to Nuevitas and was committed by the libelant and not by respondent. There was nothing in the conduct of the respondent, bad and reprehensible as that conduct was, which discharged the libelant from its obligation to perform its agreement. The fact that the libelant was intentionally misled so to delay its unloading that it could not reach the port on the north side of Cuba within the time fixed in the charter party, did not, in itself, constitute any breach of contract by the respondent. But we are far from saying that it was without effect upon the rights of the parties under the contract.

There is no reason we are aware of why fraud or misrepresentation or misconduct in the dealings had between the parties to a charter agreement should have any different effect than would follow similar conduct as between parties who had entered into any other kind of contract. And we must admit that the testimony we find in the record has not made a favorable impression upon us, or served to convince us that the characterization given to the business by the respondent's own representative, already quoted, was not deserved. But while this representation was made by the respondent, and was acted upon by the libelants to their prejudice, it is proper to add that it was made by one of respondent's subordinate officials, and that the chief officers of the respondent company denied that they had ever authorized it or that they had any knowledge of it until after the harm had been accomplished.

A court of admiralty exercises, within certain limits, equitable as well as legal jurisdiction and is entirely competent to afford certain equitable relief. In Andrews v. Essex Fire & Marine Ins. Co., 3 Mason, 6, 16, Fed. Cas. No. 374, Mr. Justice Story in 1822 said that:

"In the exercise of their general jurisdiction, courts of admiralty may be properly said to be courts of equity; that is, courts proceeding ex æquo et bono, and not confined to the narrow notions of the common law."

And in Benedict's Admiralty (2d Ed.) § 329, it is said that the court of admiralty is bound, by its nature and constitution, to determine the cases submitted to its cognizance upon equitable principles, and according to the rules of natural justice. It cannot in a technical sense be called a court of equity. It is rather a court of justice.

But there is no legal or equitable principle under which this court can hold that this culpable conduct of the respondent put an end to this contract, or relieved the libelant from its obligation to send the vessel to such port as the respondent directed. The most effect the courts could give to the respondent's conduct would be to recognize it as giving rise to an equitable estoppel.

In Bispham's Equity, § 181, it is said to be—

"the first principle upon which all courts of equity proceed that if parties who have entered into definite and distinct terms involving certain legal results—certain penalties or legal forfeiture—afterwards by their own acts, or with their own consent, enter upon a course of negotiation which has the effect of leading one of the parties to suppose that the strict rights arising under the contract will not be enforced, or will be kept in suspense, or held in abeyance, the person who otherwise might have enforced those rights will not be allowed to do so where it would be inequitable, having regard to the course of dealing between the parties."

In the American & English Encyc. of Law (2d Ed.) vol. 29, p. 1104, it is said:

"Where time of performance is of the essence of the contract, a party who does any act inconsistent with the supposition that he continues to hold the other party to his part of the agreement will be taken to have waived it altogether."

In 16 Cyc. 805, the law is stated as follows:

"While waiver is not in the proper sense of the term a species of estoppel, yet where a party to a transaction induces another to act upon the reasonable

belief that he has waived or will waive certain rights, remedies, or objections which he is entitled to assert, he will be estopped to insist upon such rights, remedies, or objections to the prejudice of the one misled."

The cases clearly establish the proposition above laid down. Lydig v. Braman, 177 Mass. 212, 58 N. E. 696; Union, etc., Bank v. Jefferson, 101 Wis. 452, 77 N. W. 889; Watkins v. Green, 101 Mich. 493, 60 N. W. 44; Hedgepeth v. Rose, 95 N. C. 41; Higgins v. Haberstraw, 76 Miss. 627, 25 South. 168; Hyde Park v. Borden, 94 Ill. 26; Youngblood v. Cunningham, 38 Ark. 571.

The effect of this misconduct, this misleading of the libelant into a belief that a few days of delay would be immaterial, was simply to estop the respondent from afterwards canceling the charter if the vessel as a result should fail to reach Nuevitas on the date fixed in the charter July 12th. It amounted simply to a waiver of the time limit. There can be no authority for saying that it put an end to the contract as a whole. It was still the duty of the steamer to go to Nuevitas even though it knew it could not arrive until after July 12th. And if it had proceeded to that port with all due dispatch and the respondent had then asserted its right to cancel the contract under the cancellation clause the courts would have denied its right to do so on the ground of estoppel.

The libelants did not perform the contract; the ship not having been sent to Nuevitas.

A plaintiff in an action upon a contract cannot succeed ordinarily, if he has himself failed to perform at the proper time; but the principle does not apply if the failure to perform is excused because of the conduct of the defendant. A plaintiff's failure to perform is unnecessary if there has been a prior serious breach of the contract by the defendant. And in like manner a plaintiff's failure to perform is excused if the defendant has repudiated the contract and given the plaintiff to understand that he will not perform the contract when it becomes due. In the one case the plaintiff's excuse for his own nonperformance is the defendant's actual breach of the contract and in the other his excuse is the prospective breach. Neither the actual breach nor the prospective breach terminates the contract in and of itself. The contract still exists, but the party not at fault has a defense and an excuse for nonperformance. See Wald's Pollock on Contracts (3d Ed. by Williston) p. 351. At the time the ship was ordered to Nuevitas, the defendant had not failed to perform and had committed no breach. It is also clear that there was no renunciation of the contract by the defendant. On the contrary, the defendant made it very clear that instead of repudiating the contract it was insisting upon a strict adherence to the contract and was proposing to adhere strictly thereto. In stating that it would cancel if the ship did not arrive at Nuevitas on July 12th it was only exercising a right which it claimed under the contract.

The testimony of the respondent was that the order to go to Nuevitas was given in order that it might not be in default. The fact that it was given in order that the boat would miss her canceling date, is not important. Neither is it, as we view it, important that at the

time the order was given the intention was to cancel on July 12th, "unless," as respondent testified "something developed," by which it was meant that it was intended to cancel unless a cargo of sugar was secured by the time the boat arrived.

As there was no actual breach of the contract on the part of the respondent, there can be no recovery of damages in this suit for the failure to furnish the libelants with a cargo of sugar under the agreement.

This conclusion makes it unnecessary for us to consider the question as to the measure of damages, and whether or not error was committed in the court below in that respect.

The decree of the District Court is reversed.

### On Motion for Rehearing.

PER CURIAM. The libelants ask for a rehearing and claim that the respondent waived its right to insist that the vessel be sent to a port on the north side of Cuba. It becomes necessary, therefore, to inquire whether there was any such waiver.

[2] The burden of proof is upon a party claiming a waiver to prove it by such evidence as does not leave the matter doubtful or uncertain. In the absence of conduct creating an estoppel, a waiver must be supported by an agreement founded upon a valuable consideration. There can be no waiver unless so intended by one party and so understood by the other, or one party has so acted as to mislead the other who is estopped thereby. 40 Cyc. 261.

In the case at bar the claim of a waiver is based upon a conversation which one of the libelants testified took place in the afternoon of July 11th (that being the afternoon on which the order to go to Nuevitas was issued) in which conversation it is now asserted that the respondent waived its right to have the ship go to that port. But the testimony does not satisfy us upon that point. That such a conversation occurred on that afternoon was denied by the vice president of the respondent company as well as by its chartering clerk. When the vice president was asked whether any such conversation occurred on that afternoon in which it was agreed that the libelants might send the boat to Turks Island for a cargo of salt and not to Nuevitas, his answer was, "It did not." In this he was substantiated by the chartering clerk, who was alleged to have been present when the conversation occurred. The vice president of the company, however, admitted that he had sent one of his agents with a message to one of the libelants, the purport of which, as he stated it, was that:

"We had no cargo, and if the boat goes to Nuevitas she will probably be late, and if we do not get cargo we will cancel, and as the chances are not strong of our getting cargo we won't order her there."

But that message was sent prior to the issuance of the order to go to Nuevitas and was revoked by the designation of Nuevitas as the sailing port which was made on the same afternoon and within the time the respondent had under the law and the charter to designate the port. The original statement that the respondent would not order the boat to Nuevitas was not supported by any consideration, and gave

rise to no estoppel as it was at once withdrawn before it had been acted upon by the issuance of the order to go to Nuevitas. That it was not regarded at the time as a waiver by the libelants appears from the letter of July 22, 1910, which they sent to the respondent and in which they state the basis of their claim but make no mention of any waiver. In that letter the libelants say they sent the ship to Turks Island because they had been told that there was no cargo at Nuevitas. If the respondent had actually agreed that the libelants need not send the ship to Nuevitas and might send it to Turks Island, it seems probable that the agreement would have been mentioned in the letter to which reference has been made. Again no mention is made of any such agreement in the libelants' letter of August 3, 1910. In that letter the idea of a waiver is for the first time advanced, but upon entirely different grounds, and grounds which seem to us to be untenable. The libelants wrote:

"While you had a right to name the loading port, we had a right to demand that the port be named a reasonable time in advance of the canceling date, and in our judgment your failure to name a loading port in spite of our repeated requests, coupled with your statement that a day or two made no difference to you, amounted to a complete waiver of the technical rights which you might have had," etc.

The respondent was not bound to designate the port until the ship was unloaded and the requests to have the port named prior thereto did not make it incumbent on the respondent to do so. The port was designated on the very afternoon the unloading was completed and the ship tendered, and in doing so the respondent fulfilled its duty in that regard. The effect of the misleading of the libelants by the respondent's statement that two or three days delay would make no difference has already been discussed and its effect stated. Our conclusion on this part of the case is that there was no waiver of the right to order the ship to Nuevitas.

The motion for a rehearing is denied.