## RABOUIN v. NATIONAL LABOR RELATIONS BOARD.

### No. 151, Docket 22063.

United States Court of Appeals
Second Circuit.

Argued Jan. 17, 1952.

Decided March 24, 1952.

L. Hand, Circuit Judge, dissented.

Harold Dublirer, New York City, for petitioner.

Bernard Dunau, Atty., National Labor Relations Board, Washington, D. C. (George J. Bott, Gen. Counsel, David P. Findling, Asso. Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, and William J. Avrutis, Atty., National Labor Relations Board, all of Washington, D. C., on the brief), for respondent.

Herbert S. Thatcher, Washington, D. C. (Harry Pozefsky, Gloversville, N. Y., and J. Albert Woll, James A. Glenn, and Joseph E. Finley, all of Washington, D. C., on the brief), for Local 294, International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America, AFL, intervenor.

Before L. HAND, AUGUSTUS N. HAND, and CLARK, Circuit Judges.

CLARK, Circuit Judge.

This case comes to us on petition to review and set aside an order of the National Labor Relations Board in so far as it dismissed a complaint charging a union with unfair labor practices under § 8(b) (2), (b) (4) (A), and (b) (6) of the National Labor Relations Act, as amended, 29 U.S.C.A. § 158(b) (2), (b) (4) (A), and (b) (6). 87 N.L.R.B. 972. The petitioner, Henry V. Rabouin, is engaged in interstate motor trucking under the business name of Conway's Express, in Albany, New York. The union, Local 294 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America, AFL—granted leave to intervene on this appeal—is the local labor organization in the trucking field.

The dispute arose during the term of an area collective bargaining agreement negotiated with the union in October, 1946, by the Highway Transport Association of Up-State New York, of which Rabouin was an active member and which he had appointed to act as his "sole representative" during the negotiations. The agreement was designed to take the place of a previous one which was about to expire. Accordingly, when its terms were finally accepted by the union and the Association representatives, two copies of the contract, signed by the former, were distributed to the Association members for their signatures. Though a party to the prior 1944–1946 agreement, Rabouin failed to sign or return his copies; thus, although he complied with its terms in all respects save that involved in the present dispute, his formal ratification or rejection remained in doubt until late in 1947. *Inter alia,* this contract provided for a closed shop, a grievance adjustment procedure, and a defined wage scale—requirements designed to bind uniformly all trucking employers in the area.

At the time the contract negotiations were in progress, Rabouin arranged to lease certain of his equipment to the Middle Atlantic Transportation Company of New Britain, Connecticut, when required by the latter to transport freight for which it had no equipment of its own available. The Board found that from the beginning Rabouin hired only non-union men for these runs. In January, 1947, the union protested against this practice as a violation of the closed-shop provision of the area contract and demanded that Rabouin hire only members of the union. Upon his refusal the dispute was submitted to the Joint Grievance Board established by the contract. Despite Rabouin's claims that he did not control the Atlantic run drivers or equipment, the Joint Grievance Board found that he had violated the contract. Rabouin then agreed to abandon the runs and dispose of the excess equipment thus employed, alleging that the Atlantic arrangement would not economically permit him to honor the union wage scale.

Nonetheless he continued to provide drivers and trucks for Atlantic trips. On September 10, 1947, the union, once again on notice of his use of non-union employees, called a strike of its eight members at Rabouin's Albany terminal. Two days later Rabouin entered into settlement negotiations with the union and, for the first time, formally disavowed the contract. In reply the union established three conditions for a strike settlement: (1) the payment to the union of wages equivalent to those paid on the September 10th run, (2) Rabouin's signature on the contract "without the arbitration clause," and (3) a $5,000 performance bond. This last was designed to insure its members against wage defaults which had occurred in the past. Rabouin consented to these conditions, but failed to perform, assigning his inability to secure the bond, and the settlement negotiations failed.

The union then moved to bring other pressures on Rabouin, who continued local operations with non-union drivers. At least three different companies honored its request—each time addressed to either representatives of management or supervisors —not to accept his shipments; and some three others, as parties to the area agreement which contained a struck cargo provision, voluntarily refused to permit him to unload freight at their terminals.

The strike of the Rabouin employees was finally enjoined on January 17, 1948, following a preliminary injunctive proceeding brought by the General Counsel under § 10(j, *l*) of the Act, 29 U.S.C.A. § 160 (j, *l*). Douds v. Local 294, D.C.N.D.N.Y., 75 F.Supp. 414. After the trial examiner's hearing and intermediate report, the Board found that the Union had violated § 8(b) (1) (A) guaranteeing an employee's right not to engage in a strike, by its coercive threats to one of Rabouin's non-union drivers during the strike, and § 8(b) (3) in failing to bargain collectively, by its demand for the performance bond—issues not appealed by the union. It refused to find, however, that the September, 1947, settlement move for a closed shop was illegal, that the strike constituted a secondary boycott, or that the demand that Rabouin make up wages lost on the September 10th Atlantic run was an "exaction." This petition for review questions the validity of these determinations.

Petitioner's first contention, that the union's proposed settlement in September, 1947, violated the anti-closed-shop provisions of § 8(b) (2), raises the question whether this demand is to be interpreted as a requirement that Rabouin "enter into" a closed-shop agreement or, as the Board found, that he merely "furnish evidence" of a previous obligation to this effect. For the Labor Management Relations Act was enacted on June 23, 1947, or prior to the union's settlement offer, but subsequent to the area contract. While this Act outlawed the closed shop, it contained a provision, § 102, 29 U.S.C.A. § 158 note, making this prohibition inapplicable to contracts made before its enactment. Hence if Rabouin was bound by the area contract, and never discharged from its obligation, it remains in effect until the end of its two-year term.

We agree with the Board that Rabouin was a party to the pre-existing area contract. It was negotiated on his behalf.

He enjoyed its benefits of general labor accord. He complied with its wage scales. And he exploited its grievance adjustment procedure when first threatened with a union dispute in January, 1947, and agreed to abide by the Joint Grievance Board's conclusion that the closed-shop provision applied to his Atlantic arrangement.

■ Moreover, his claim that the union may not rely on the previous contract because of his own failure formally to ratify it is not only inconsistent with his own actions; it is without legal substance as well. There is nothing in the Act which compels the conclusion that collective bargaining contracts must be formally attested by the parties; rather, § 8(d), codifying the rule of H. J. Heinz Co. v. N. L. R. B., 311 U.S. 514, 61 S.Ct. 320, 85 L.Ed. 309, specifically provides for a written agreement "if requested by either party" —clear evidence that a writing is not mandatory as a matter of law. Hamilton Foundry & Machine Co. v. International Molders & Foundry Workers, 6 Cir., 193 F.2d 209, 214. Rabouin's failure to sign the contract during his compliance with it thus cannot affect the Board's conclusion that he was bound by its closed-shop provisions; any other result would force the give-and-take reality of labor relations into a strait-jacket of lawyers' technicalities.

■ But petitioner also alleges the invalidity of the 1946 contract as to him on the ground that the New York Statute of. Frauds, N.Y.Personal Property Law, McK.Consol.Laws, c. 41, § 31, voids all agreements not to be performed within one year which are not signed by the party to be charged. The contention can have no weight; the vagaries of state rules of law may not override provisions of a federal act geared to the effectuation of an important national labor policy. Hill v. State of Florida ex rel. Watson, Atty. Gen., 325 U.S. 538, 65 S.Ct. 1373, 89 L.Ed. 1782; N. L. R. B. v. Hearst Publications, 322 U.S. 111, 123, 64 S.Ct. 851, 88 L.Ed. 1170. A state statute of frauds, no matter what its wording, cannot transform into an unfair labor practice activity under the Act otherwise validated by a binding oral contract between employer and union. Cf.

Hamilton Foundry & Machine Co. v. International Molders & Foundry Workers, supra, 193 F.2d at page 215.

■ Moreover, even under the provisions of the New York statute, the contract is merely rendered unenforceable in an affirmative action; it may nonetheless be used, as here, in support of a proper defense to some claim of tort, 2 Corbin on Contracts § 299, supplementing § 279, 1950, or breach of contract asserted by the non-signatory party, De Beerski v. Paige, 36 N.Y. 537; Restatement, Contracts, N.Y.Annot. 113, 1933. Even if the union were barred from alleging Rabouin's violation of § 8(a) by failure to comply with the contract, yet, where the latter seeks to exploit his own dereliction as a ground for relief, the contract may be shown despite the fact that he did not sign it. For in such a case Rabouin is not the party to be charged. Restatement, Contracts § 217(1) and comment a, 1932; Crane v. Powell, 139 N.Y. 379, 383, 384, 39 N.E. 911.

■ Nor was Rabouin, thus originally bound by the 1946 area agreement, released from his obligation by the union's refusal to terminate its strike in October, 1947. It is now lately suggested that the strike, coupled as it was with a demand that Rabouin sign the contract, pay certain back wages, and post a performance bond, constituted a breach in repudiation of the contract, consequently erasing it, together with all future protection for closed-shop demands under § 102. The facts do not support this interpretation. Rabouin had already disowned the contract and it was to this departure from his obligation to honor the closed shop that the strike was directed. The performance bond condition, which held back settlement of the strike, was requested because the union felt itself entitled to some guaranty that his future recalcitrance would not again result in wage defaults; it was not designed to wipe out the area agreement or to substitute a totally new set of rights and duties in derogation of it. The settlement offer was then not inconsistent with the contract in any way. Each party could—and the union intended that each should—con-

tinue to abide by all its provisions: the one bound to honor the specified wage scale, closed shop, and working conditions, the other, to continue to work as agreed.

■ An anticipatory breach by repudiation sufficient to justify no further performance by the other party arises only when the disaffirmance of the contract is "total" and "unconditional." 4 Corbin on Contracts §§ 946, 954, 972, 973, 1951; Restatement, Contracts § 318; 5 Williston on Contracts §§ 1324, 1325, Rev.Ed.1937. Since here the bond was to insure performance, not abrogation, of the contract, request for it cannot properly be interpreted as "an unqualified refusal, or declaration of inability, substantially to perform according to the terms of his obligation." Mobley v. New York Life Insurance Co., 295 U.S. 632, 638, 55 S.Ct. 876, 878, 79 L.Ed. 1621. "Repudiation there was none as the term is known to the law. Petitioner did not disclaim the intention or, the duty to shape its conduct in accordance with the provisions of the contract. Far from repudiating those provisions, it appealed to their authority and endeavored to apply them." Cardozo, J., in New York Life Ins. Co. v. Viglas, 297 U.S. 672, 676, 56 S.Ct. 615, 616, 80 L.Ed. 971. The request for a performance bond thus did not affect the continuance of the mutual obligations created by the 1946 area agreement. Dingley v. Oler, 117 U.S. 490, 6 S.Ct. 850, 29 L.Ed. 984; Higgins v. California Prune & Apricot Growers, 2 Cir., 16 F.2d 190, certiorari dismissed 273 U.S. 781, 47 S.Ct. 460, 71 L.Ed. 889; Hasler v. West India S. S. Co., 2 Cir., 212 F. 862. It should again be noted—a fact which tends to be overlooked—that it was Rabouin, and not the union, who repudiated the contract, and thus brought on the union's efforts so clearly directed to keeping it alive. Simple contract law requires that Rabouin thus not profit from his own primary wrong. Nor has he to this day made that particular claim.

■ Nor do we accept the argument that petitioner was discharged from the closed-shop provisions by reason of the conditional settlement offer made by the union in September, 1947, on the asserted ground that the offer effected a substituted contract. In fact it went for naught. Rescission, to be effective, must be mutual, Elterman v. Hyman, 192 N.Y. 113, 126, 84 N.E. 937, and the substitution of a new contract for an old one must be made binding by complementary promises. Matter of Huxley, 294 N.Y. 146, 61 N.E.2d 419, 169 A.L.R. 194; 6 Corbin on Contracts 147, 1951; Restatement, Contracts § 408, comment a. Rabouin, unable to satisfy the demand for a performance bond, never entered into the agreement the union proposed. Since it thus can have no effect as establishing a new relationship between the parties, the previous contract remained operative as it had been before. In so concluding, we are not unmindful of the fact that the Board (against one member's vigorous dissent) found the union's request for a performance bond to be an unfair labor practice. 87 N.L.R.B. 972. But this conclusion can mean at most only that the union committed a partial breach, not inconsistent with its further performance, and thus not sufficient to absolve petitioner from his duties. Moreover, we see no reason why such a holding—from which the union failed to appeal—should operate to preclude the Board and us from deciding, in terms of ordinary contract law, that the contract continued in effect.

Petitioner also sees in the union's pressure on neutral employers to stop accepting his shipments a violation of the secondary boycott provisions. § 8(b) (4) (A). Even if the demands carried with them an implicit threat to strike, we cannot agree that they tended to induce or encourage the employees to engage in a strike or concerted refusal forcing the employer to cease doing business with another. The embargo on Rabouin's goods was the product solely of requests addressed to management or supervisory personnel. The former are clearly employers, and the latter have lately been so defined by the new § 2(2, 11), 29 U.S.C.A. § 152 (2, 11). The union thus did not "encourage the employees."

■ Nor did it bring about the strike or concerted activity prohibited by § 8(b) (4) (A). See N. L. R. B. v. International

Rice Milling Co., 341 U.S. 665, 71 S.Ct. 961, 95 L.Ed. 1277. Petitioner urges us to read into this formula an additional proscription of threat of sanctions against third parties, arguing for this as an interpretative device to make the section workable. Perhaps such an interpretation would have been justifiable or desirable were this a new statute of less general significance. But in a matter of such bitter controversy as the Taft-Hartley Act, the product of careful legislative drafting and compromise beyond which its protagonists either way could not force the main body of legislators, the courts should proceed cautiously. For it would appear that Congress has already spoken in this regard. The House version of the bill, H.R. 3020, 80th Cong., 1st Sess., incorporated the rule against threat to strike that petitioner would have us adopt, in §§ 2(14), 12(a) (3); but the present phraseology is the product of a joint conference wherein the Senate's draft to the contrary was adopted. 1 N.L.R.B., Leg. Hist. of the Labor-Management Relations Act 42, 112–113, 168–169, 204–205, 240, 540, 547. See Schatte v. International Alliance, etc., 9 Cir., 182 F.2d 158, 165, certiorari denied 340 U.S. 827, 71 S.Ct. 64, 95 L.Ed. 608, construing similarly the parallel wording of § 303, 29 U.S.C.A. § 187. We should not interpolate into the Act restrictions against union activity which Congress has purposely deleted. N. L. R. B. v. National Maritime Union of America, 2 Cir., 175 F.2d 686, 690, certiorari denied National Maritime Union of America v. N. L. R. B., 338 U.S. 954, 70 S.Ct. 492, 94 L.Ed. 589.

The union cannot have committed an unfair labor practice under this section in regard to those employers who refused to handle Rabouin's shipments under the terms of the area agreement provision relating to cargo shipped by struck employers. Consent in advance to honor a hot cargo clause is not the product of the union's "forcing or requiring any employer * * * to cease doing business with any other person." § 8(b) (4) (A).

■ Of course, the direct strike against petitioner himself is not a secondary boycott. The distinction between the primary and secondary employers for the purposes of this section is now well recognized. N. L. R. B. v. International Rice Milling Co., supra, 341 U.S. at page 671, 71 S.Ct. 961; N. L. R. B. v. Denver Bldg. & Construction Trades Council, 341 U.S. 675, 687–688, 71 S.Ct. 943, 95 L.Ed. 1284. Sec. 8(b) (4) (A) forbids only a strike against the latter; primary concerted activity is specifically preserved by § 13, 29 U.S.C.A. § 163. Here though the source of conflict was Rabouin's lease arrangement with Atlantic, the union was striking not for the purpose of bringing this to a halt, but rather solely to force Rabouin—as the primary employer—to hire only its own members for these runs pursuant to the contract. The union had nothing to gain from choking off Atlantic's business, for its dispute was not with that company. The mere fact that petitioner may have been forced to cease the lease arrangement with this neutral as a by-product of his own local labor difficulties cannot bring the strike against him within the category of a secondary or prohibited boycott. N. L. R. B. v. Service Trade Chauffeurs, etc., 2 Cir., 191 F.2d 65.

■ Petitioner also cites the union's demands for an amount equal to the wages paid the non-union driver of the September 10th Atlantic trip as "an exaction, for services which [were] not performed," in violation of § 8(b) (6). We do not agree. Demand for wages by the union is forbidden only "where no work had been done," American Newspaper Publishers Ass'n v. N. L. R. B., 7 Cir., 193 F.2d 782, 801; and work was done here. We think the use of the ambiguous passive significant. For to read into the section a requirement that the work must have been done by the one to receive the wages not only would bar a justified claim such as this on the part of one wrongfully deprived of a job under the contract, but also would warp § 8(b) (6) into a broader provision than it was intended to be. The continued references to featherbedding in the House which was the source of the provision, see H.R. 3020, 80th Cong., 1st Sess., make it clear that the section is aimed solely at demands for stand-by labor and the like. The wage re-

quest here does not fall within that category.

'Petition denied; order affirmed.

L. HAND, Circuit Judge (dissenting).

Section 102 of Chapter 120 of the Public Laws of 1947, 61 St. at L. page 152, provided that "the provisions of section 8 (a) (3) and section 8(b) (2) * * * shall not make an unfair labor practice the performance of any obligation under a collective-bargaining agreement entered into prior to the date of the enactment of this Act". The Union's strike called on September 10, 1947 would have been an "unfair labor practice" under the New Act except for the contract of 1946, which was still in existence and which made the strike one to enforce "the performance of" a valid "obligation" of Rabouin. On the other hand, if the contract came to an end, the "closed shop" became unlawful, and the strike also became unlawful. The Board found that during the negotiations which began on September 27, 1947, "the Union took the position that it would not terminate the strike unless Rabouin, among other things, would post a $5000 performance bond." It also found that the Union's insistence upon his posting the bond was itself an "unfair labor practice"; although it did not hold that it ended the contract. Rabouin agreed to post such a bond provided he could get one; but on October 2nd he wrote to the Union that he could not "obtain such a bond"; that his "only alternative * * * is to resume operations without a labor agreement"; and that he would assume that the Union would "not care to negotiate such an agreement and will start operations if I do not hear from you in writing by nine (9) A. M. October 6, 1947." The Union did not answer this letter, but continued the strike until it was enjoined in January.

We must distinguish between a repudiation and what may have been the occasion of it. In the case at bar the Union's repudiation was complete and unconditional; it declared that it would keep the men on strike as long as Rabouin did not post a bond, and while the men stayed out, no part of the contract could be performed, for it concerned only the employment of Union members by Rabouin. Such cases as Mobley v. N. Y. Life Insurance Co., 295 U.S. 632, 55 S.Ct. 876, 878, 79 L.Ed. 1621, and N. Y. Life Insurance Co. v. Viglas, 297 U.S. 672, 56 S.Ct. 615, 80 L.Ed. 971, decide that to be a repudiation the promisor's statement must be "an unqualified refusal * * * substantially to perform according to the terms of his obligation"; and of course I agree. But that is exactly what the Union did; it declared that it would not "perform according to the terms of his obligation", for it said that it would not let the men go back, unless a new term was added to those already agreed to. It would not, indeed, have made any difference whether the new term was trivial or important, in either case the Union would have refused to "perform according to the terms of his obligation" as it stood; a promisor does not perform when he imposes upon his performance a condition to which the promisee has not agreed. However, if it made any difference, the term on which the Union insisted was anything but trivial; it changed Rabouin's promises from unsecured to secured liabilities; it made it impossible for him to go on; and, as I have said, insistence upon it was important enough to be an "unfair labor practice."

I agree that the Union did not break the contract and that Rabouin did; but that does not mean that after the Union repudiated it, any part of the contract remained in existence. It has never been doubted that, when a promisee repudiates because of the promisor's breach, the promisor is excused from performance of his counter promises (Restatement of Contracts, § 280(1) ). It makes no difference that the repudiation is because of the promisee's own breach; indeed it must be in order to be valid. Moreover, the promisee may not repudiate by halves; he must repudiate in whole, or not at all. La Cueva Ranch Co. v. Brewer, 7 Cir., 283 F.Rep. 963, 964; Sylvania Industrial Corporation v. Lilienfeld's Estate, 4 Cir., 132 F.2d 887, 893, 145 A.L.R. 612. True, he may retract before the promisor has acted on it (Restatement of Contracts § 280(2) and § 319), but the Union never retracted. What it

tried to do, and has so far been successful in doing, is, not to repudiate, but to force upon Rabouin a new contract. I do not understand the reasoning by which that result is reached; and indeed all that is relevant here is whether the contract of 1946 was in existence after October 6th; for if it was not the strike was unlawful.

My brothers do not suggest that when in § 102 Congress used the words "the performance of any obligation under a collective bargaining agreement," it did not mean that the continued existence of "any obligation" should not be determined by the same principles that determine the duration of any other contractual obligation. I agree that, if this be not true, the Board would be free to disregard those principles, and decide whatever they thought would best conduce to effect the underlying purpose of the Act. Yet even then I should say that, when Congress proscribed the "closed shop" in futuro and allowed it to survive only so far as the parties had already agreed to abide by it, it would not conduce to effect the purposes of the New Act to preserve the "closed shop," when the common law would have deemed the parties to have put an end to it. The "policy" of the New Act was opposed to such contracts, and the Board was not free to assume the contrary. That would be my conclusion if my decision were unfettered, and I think that it would not be so fettered that I should not be free so to decide. Although we may not be justified in reviewing findings of the Board upon issues in which they are better versed than we;* I should suppose that there must remain some area in which we may differ from the Board's decision even upon a point of "policy"; and, if so, it would appear to me that, for the reasons I have tried to state, it would be wrong not to apply principles of common-law to the contract here.

However, I think that in this instance no question of "policy" can arise anyway. When Congress uses words of ordinary meaning in a statute, they should be construed to have those legal consequences which such words have in other settings, unless there is some sound reason for construing them otherwise. Quite aside from Congress' expressed disapproval of the "closed shop," it seems to me that the phrase, "obligation under a collective bargaining agreement," must be taken to mean such an "obligation" as such an "agreement" would create, lasting only as long as it would at common-law; and that it did not mean by implication to incorporate such determinants as the Board might think would promote industrial peace. That would throw the reins completely upon the neck of the Board. It is the chance that the opposite view may be thought to have been decisive here—in spite of its absence in my brothers' opinion—that gives this appeal more than a passing importance, if indeed its practical importance has not already altogether passed.

I express no opinion on the other points decided, because they become unimportant if I am right in what I have just said. I think that the order should be reversed so far as Rabouin petitioned to reverse it.

---

\* Phelps Dodge Corp. v. Nat. Lab. Rel. Board, 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271.