245 F.2d 817
 MILK DRIVERS AND DAIRY EMPLOYEES LOCAL UNION NO. 338,
INTERNATIONAL BROTHERHOOD OF TEAMSTERS,
CHAUFFEURS, WAREHOUSEMEN & HELPERS OF
AMERICA, AFL-CIO, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
MILK DRIVERS AND DAIRY EMPLOYEES LOCAL UNION NO. 680,
INTERNATIONAL BROTHERHOOD OF TEAMSTERS,
CHAUFFEURS, WAREHOUSEMEN & HELPERS OF
AMERICA,AFL-CIO, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
 Nos. 346, 347, Dockets 24368, 24443.
 United States Court of Appeals,
Second Circuit.
 Argued May 14, 15, 1957.
Decided June 19, 1957.
 
 Samuel J. Cohen, New York City, for petitioner Milk Drivers & Dairy Employees Local Union No. 338.
 Thomas L. Parsonnet, of Parsonnet, Weitzman & Oransky, Newark, N.J. (Samuel J. Cohen, New York City, on the brief), for petitioner Milk Drivers & Dairy Employees Local Union No. 680.
 Norton J. Come, Atty., N.L.R.B., Washington, D.C. (Jerome D. Fenton, Gen. Counsel, Stephen Leonard, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Rosanna A. Blake, Atty., N.L.R.B., Washington, D.C., on the brief), for respondent.
 Before CLARK, Chief Judge, and SWAN and POPE, Circuit Judges.
 CLARK, Chief Judge.
 
 
 1
 Milk Drivers and Dairy Employees Local 338 and Milk Drivers and Dairy Employees Local 680 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America, AFL-CIO, petition this court to review and set aside two orders of the National Labor Relations Board based on findings by the Board that each petitioner was guilty of violating §§ 8(b)(4)(A) and 8(b)(4) (B) of the Labor Management Relations Act of 1947, 29 U.S.C. §§ 158(b)(4)(A) and 158(b)(4)(B). 116 N.L.R.B. No. 195. The Board seeks enforcement of these orders. The two cases spring from a common factual background and were consolidated before the Board. The orders are directed against refusals by the locals to handle 'hot cargo,' i.e., products received by a secondary employer from a primary employer with whom they have a labor dispute.
 
 
 2
 Crowley's Milk Company, Inc., the primary employer, operates four large plants, where it manufactures and processes milk, cheese, ice cream, and other dairy products which it sells to numerous distributors. Crowley's employees are and were represented by other unions, and since 1948 Locals 338 and 680 have unsuccessfully attempted to become these employees' bargaining representatives. In 1955 the two locals adopted a common plan whereby on April 1, 1955, Local 338 would begin to picket Crowley's two New York plants and simultaneously Local 680 would start to picket Crowley's New Jersey plant. The locals were in a position to jeopardize Crowley's business relations with ice cream and milk distributors, because the employees of many of these distributors were members of the two locals. The distributors and the two locals were parties to several collective bargaining agreements containing the following hot cargo clause:[1]
 
 
 3
 'It shall not be a violation of this agreement for members of the Union to refuse to handle material in the possession of the Employer received from any employer with whom Local 338, or Local 584, or Local 602, or Local 607, or Local 680 is directly engaged in a labor dispute, provided such material comes into the Employer's possession more than 48 hours after the union gives written notice to the Employer of the existence of such labor dispute. It shall not be a violation of this agreement for the members of the union to refuse to make deliveries to or pickups from any employer with whom Local 338, Local 584, or Local 602, or Local 607, or Local 680 is directly engaged in a labor dispute, provided such refusal occurs more than 48 hours after the union has given written notice to the Employer of the existence of such labor dispute.'
 
 
 4
 Thus in the event of a serious dispute between Crowley's and these locals it was likely that the employees and perhaps the employers of some of Crowley's customers would be loath to handle Crowley's products. The cases are concerned with the unions' relations with these secondary employers; the unions' relations with the primary employer, Crowley's, are not before us.
 
 
 5
 The facts of the case involving Local 338 are not disputed. On March 17, 1955, the local sent a letter to all employers who were parties to collective agreements with it, notifying them that the two locals were directly engaged in a labor dispute with Crowley's, reminding them of the hot cargo clause, and announcing: 'We shall expect that, by or before April 1, 1955, you will discontinue receipt of any materials of Crowley's Milk Company * * * as long as this labor dispute continues.' Edward Greco d/b/a Maple Grove Dairy was one of the secondary employers notified, and he replied that he would not co-operate for six to eight weeks, until he could get containers made up under his trade name for the by-products normally purchased from Crowley's. Negotiations between Greco and Local 338 continued until August 8, 1955, at which time Greco's employees, on instructions from the union, refused to handle Crowley's products. Greco did not acquiesce in his employees' refusal, but on August 9 posted a written notice on the bulletin board in the company drivers' room directing them to distribute and sell Crowley's products. Notwithstanding the notice, the employees on instructions from Local 338 refused to handle the products.
 
 
 6
 There is disagreement as to the activities of Local 680, but it is clear that it sent notices almost identical to those described above to numerous secondary employers who were customers of Crowley's. These notices were also sent to union stewards of these secondary employers with the following explanatory note:
 
 
 7
 'Dear Sir and Brother:
 
 
 8
 'Enclosed find copy of letter that was sent to your employer. Please see to it that all members under your jurisdiction will abide by the enclosed letter.'
 
 
 9
 It was stipulated that some stewards posted these letters on the bulletin boards, and there is evidence that some members of the union were informed of their contents by word of mouth. Since the Intermediate Report, which the Board majority adopted, does not resolve the conflicts in testimony as to the union's policy, we adopt for purposes of decision here the union's version that it encouraged the secondary employees to refuse to handle Crowley's goods after April 1 unless and until secondary employers gave direct orders to do so. In fact the union contended that its policy was even milder, eschewing 'concerted' refusals under any conditions; but there is substantial evidence to support the finding that concerted action was sought.
 
 
 10
 The trial examiner did not determine whether or not the secondary employers involved in the Local 680 case gave direct orders to handle hot cargo which the union ordered disobeyed. His reason, adopted by the Board, was that under recent rulings of the Board it is an unfair practice for a union to encourage concerted refusals to handle goods of other employers, regardless of employer acquiescence in the invocation of a hot cargo clause. The Board recognizes that these recent decisions are opposed to our holding in Rabouin v. N.L.R.B., 2 Cir., 195 F.2d 906, and asks us to overrule that case.
 
 
 11
 This is not the occasion for reversing ourselves in deference to administration expertise, for the legal question is one of legislative intent and statutory construction as to which the courts are fully competent and, indeed, have the ultimate responsibility. Moreover, the present issue has divided the agency into three fragmentary views which seem to be still in the process of development. Having satisfied ourselves again that our former position appears sound, we reaffirm our earlier decision. In view, however, of the Board's new position and the division among the circuits, perhaps some further analysis is in order.
 
 
 12
 In the Board's first encounter with this problem a majority found no unfair practice where the union's concerted refusal was in accordance with a hot cargo clause and the secondary employers acquiesced rapidly in the employees' refusal to touch hot cargo. The majority opinion stated three reasons for its result: (1) doubt as to whether the boycott was 'secondary'; (2) the employers' rapid acquiescence after the union started the boycott; (3) the employers' advance consent embodied in the hot cargo clause. The Board explained the last ground, saying that where the employer consented in advance by putting such a clause in the collective bargaining agreement there was not "a strike or a concerted refusal in the course of their employment to use' etc. 'where an object thereof is: (A) forcing or requiring" because the advance agreement of the employer deprived the later union acts of the requisite quality of insubordination. Rabouin d/b/a Conway's Express, 87 N.L.R.B. 972, 982, n. 29, with Chairman Herzog concurring in the result and one member dissenting. We affirmed the Board's result, approving this third rationale. Rabouin v. N.L.R.B., supra, 2 Cir., 195 F.2d 906, 912: 'Consent in advance to honor a hot cargo clause is not the product of the union's 'forcing or requiring any employer * * * to cease doing business with any other person.' § 8(b)(4)(A).'
 
 
 13
 The statutory language is clear: there is no violation of § 8(b)(4) unless the union encourages the employees to coerce the secondary employer. Where the employees are encouraged only to exercise a valid contractual right to which the employer has agreed there is no coercion.[2] Normally the secondary employer receives something at the bargaining table in exchange for granting the hot cargo clause, and he is no more coerced when the employees subsequently exercise their privilege than a landowner is coerced when those to whom he has granted licenses cross his land.
 
 
 14
 It will not do to say that encouraging work stoppages should be an unfair practice even in the absence of secondary employer coercion because the effect on the primary employer and the public at large is the same although the secondary employer consents. There is some difference to the public between an ordinary boycott of which it had no warning and which may be called for any purpose and a refusal to handle strike-bound goods under the terms of a hot cargo clause. The latter stoppage is less vexatious because it can be anticipated and is limited to the situations prescribed in the clause. But even without such distinctions in effect the Congressional language is clear and we should not expand the prohibitions of the Act merely because the language which eventually emerged from the legislative struggle produces some anomalies. See Rabouin v. N.L.R.B., supra, 2 Cir., 195 F.2 906, 912.
 
 
 15
 Both the petitioners and the Board see in the legislative history some factors to support their respective positions. The Board points to the Congressional abhorrence of secondary boycotts,[3] and the petitioners find indications that invocation of a hot cargo clause was not what the congressmen meant by 'secondary boycott.'[4] The Board stresses the interference with the public interest produced by any work stoppage,[5] and the petitioners point out that more recent efforts to get Congress to outlaw hot cargo clauses were defeated.[6] We do not think such tangential legislative history authorizes us to go behind the clear language.
 
 
 16
 The Board's latest position, as we understand it, is that hot cargo clauses are not contrary to public policy, but that encouraging union men to exercise them is an unfair practice. This view started with the concurring opinion of Chairman Farmer in McAllister Transfer, Inc., 110 N.L.R.B. 1769, 1788-1790.[7] Chairman Farmer first stressed, as do we, the statute's requirement that the secondary employer be coerced. He then distinguished our Rabouin decision on the ground that the secondary employers there had immediately acquiesced in the boycott, whereas the secondary employers in the McAllister case 'posted notices to their employees directing them to handle all freight without discrimination.' 110 N.L.R.B. 1769, 1790. He thus made determinative the secondary employer's reaction to the union's invocation of the hot cargo clause.[8]
 
 
 17
 Since Chairman Farmer's opinion this doctrine had undergone considerable change. In Sand Door and Plywood Co., 113 N.L.R.B. 1210, enforced N.L.R.B. v. Local 1976, United Brotherhood of Carpenters and Joiners of America, AFL, 9 Cir., 241 F.2d 147, a two-member majority declared that it was expressing 'essentially the view expressed by Chairman Farmer in his concurring opinion in the McAllister case' and went on to amplify: 'The employer, but not the union, may instruct his employees to cease handling goods sought to be boycotted. Until the employer instructs his employees that they need not handle the 'unfair' product, a strike or concerted refusal to handle such goods (is an unfair practice).'[9] In this version it is an unfair practice to invoke a hot cargo clause while the employer remains silent as to whether he acquiesces or not. Presumably the 'majority' in the Sand Door case would not have distinguished Rabouin, but overruled it.[10] The Sand Door majority, whose language the present trial examiner took to be the law, did not discuss the requirement of coercion, but instead quoted selected passages from the legislative history demonstrating that the lawmakers were against secondary boycotts and in favor of the public interest.[11]
 
 
 18
 The doctrine received a further development in American Iron and Machine Works Co., 115 N.L.R.B. 800, enforcement denied General Drivers, Chauffeurs, Warehousemen and Helpers Union, Local No. 886, AFL-CIO v. N.L.R.B., D.C.Cir., 1957, 247 F.2d 71, 73. There a two-member majority, expressly relying on the Sand Door case, restated the doctrine as follows: 'Thus, while Section 8(b)(4) (A) does not forbid the execution of a hot cargo clause or a union's enforcement thereof by appeals to the employer to honor his contract, the Act does, in our opinion, preclude enforcement of such clause by appeals to employees, and this is so whether or not the employer acquiesces in the union's demand that the employees refuse to handle 'hot' goods. Accordingly, in affirming the Trial Examiner, we do not find it necessary to rely as he did, on the fact that the secondary employers herein did not acquiesce in the refusal of their employees to handle American Iron's freight.'[12] In this most recent statement the reaction of the secondary employer had become wholly irrelevant, and there is still no explanation as to how the majority supplies the missing element of 'coercion.' Although only this latest position is urged upon us by the Board, we have considered both it and Chairman Farmer's original version and rejected them both. The latest Board view fails to distinguish between instances of employer coercion and instances of employer consent. Chairman Farmer's position, while recognizing the need for such a distinction, ignores the statutory language requiring a 'strike' or 'concerted refusal in the course of their employment.' In the absence of a prior agreement, work to be done by employees is determined unilaterally by the employer; but where a collective agreement specifies the work to be done, that agreement defines the normal work of the employees and a 'strike' or 'refusal' must be a refusal to do that normal work. The employer obviously cannot impose additional work on the employees contrary to the agreement and then charge that their refusal to perform it constitutes an unfair practice. We see no difference in this respect between tasks exempted by the agreement because they are offensive to health or safety and tasks exempted because their performance is contrary to the interests of organized labor and, in this case, the local itself.
 
 
 19
 We also do not accept the argument that hot cargo clauses are against public policy. The advocates of this view ignore the statutory language to talk about 'secondary boycotts' and the undoubted Congressional dislike of them. Having assumed that refraining from work described in a hot cargo clause is a 'secondary boycott,' they frame the issue in terms of whether a hot cargo clause is a defense to a § 8(b)(4) unfair practice.[13] We cannot agree with this characterization of the issue. There is no need for a 'defense' unless there has been a violation; and in determining the latter question we look to the statutory language, rather than the vague concept 'secondary boycott,' about which the legislators sometimes talked, but which they did not write into the Act.[14] For the reasons already given we hold that there is no 'forcing,' 'requiring,' 'concerted refusal in the course of their employment,' or 'strike,' and consequently no violation.
 
 
 20
 Petitions to review granted; orders reversed and enforcement denied.
 
 
 21
 SWAN, Circuit Judge (concurring).
 
 
 22
 I concur in the result. The Board recognizes that the orders are opposed to our decision in Rabouin v. N.L.R.B., 2 Cir., 195 F.2d 906 and asks us to reconsider it. I am unwilling to reconsider a problem so recently passed upon by this court and have not done so. Consequently I would deny enforcement and reverse the orders on the authority of the Rabouin case.
 
 
 
 [1]
 In Local 680's contract the secondary employers also agreed that they would 'not aid other companies in any fight that may be waged against the Union.'
 
 
 [2]
 Accord, General Drivers, Chauffeurs, Warehousemen and Helpers Union, Local No. 886, AFL-CIO v. N.L.R.B., D.C.Cir., 1957, 247 F.2d 71; Madden v. Local 442, international Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, A.F.L., D.C.W.D.Wis., 114 F.Supp. 932. Contra: N.L.R.B. v. Local 1976, United Brotherhood of Carpenters and Joiners of America, AFL, 9 Cir., 241 F.2d 147; Douds v. Milk Drivers and Dairy Employees Local No. 680, D.C.N.J., 133 F.Supp. 336, 341-342 (dictum); Alpert v. United Brotherhood of Carpenters and Joiners of America, AFL-CIO, D.C.Mass., 143 F.Supp. 371, noted 70 Harv.L.Rev. 735 (1957); Note, Hot Cargo Clauses as Defenses to Violations of Section 8(b)(4)(A) of the LMRA, 64 Yale L.J. 1201 (1955); cf. N.L.R.B. v. Local 11, United Brotherhood of Carpenters & Joiners of America, AFL, 6 Cir., 242 F.2d 932
 
 
 [3]
 93 Cong.Rec. A-1222, 4198-4199, 4838, 4863; Sen.Rep. No. 105, 80th Cong., 1st Sess. 8, 22; Hearings before Senate Committee on Labor and Public Welfare on S. 55 and S.J.Res. 22, 80th Cong., 1st Sess. 381-398, 1715-1729
 
 
 [4]
 These are collected in the dissenting opinion of Members Murdock and Peterson in McAllister Transfer, Inc., 110 N.L.R.B. 1769, 1790-1799
 
 
 [5]
 93 Cong.Rec. A-1222, 4198, 4838, 4860, 4863
 
 
 [6]
 S. 2989, 83d Cong., 2d Sess., printed at 100 Cong.Rec. 6125; S. 3842, 84th Cong., 2d Sess., printed at 102 Cong.Rec. 8021
 
 
 [7]
 Prior to McAllister the Board decided Pittsburgh Plate Glass Co., 105 N.L.R.B. 740, in which it not only reaffirmed its approval of our Rabouin decision, but buttressed it by construing the words in § 8(b)(4) 'in the course of their employment' as requiring that the work which the secondary employees refuse to perform be work which they previously agreed to perform
 
 
 [8]
 Chairman Farmer's vote was decisive because two other members adhered to the original Rabouin decision and the two 'majority' members thought hot cargo clauses were against public policy
 
 
 [9]
 113 N.L.R.B. 1210, 1216, n. 20, 1217
 
 
 [10]
 In addition to the 'majority' opinion one member concurred on the ground that the clauses were against public policy and two members dissented, adhering to the Board's earlier view
 
 
 [11]
 113 N.L.R.B. 1210, 1216, n. 21
 
 
 [12]
 115 N.L.R.B. 800, 801. As in Sand Door, one member concurred and two dissented
 
 
 [13]
 McAllister Transfer, Inc., supra, note 4, 110 N.L.R.B. 1769, 1777-1786; Sand Door and Plywood Co., 113 N.L.R.B. 1210, 1219-1220, enforced N.L.R.B. v. Local 1976, United Brotherhood of Carpenters and Joiners of America, AFL, 9 Cir., 241 F.2d 147; American Iron and Machine Works Co., 115 N.L.R.B. 800, 802-803, enforcement denied General Drivers, Chauffeurs, Warehousemen and Helpers Union, Local No. 886, AFL-CIO v. N.L.R.B., D.C.Cir., 1957, 247 F.2d 71
 
 
 [14]
 See Note, Hot Cargo Clauses as Defenses to Violations of Section 8(b)(4) (A) of the LMRA, 64 Yale L.J. 1201, 1206(1955). This point is recognized by the Senator who has introduced one of the bills cited in note 6 supra, designed to outlaw hot cargo clauses. After pointing out that the present statutory phraseology has not proven sufficient to cover all cases of secondary boycott and stating that 'the present Board has adopted a more reasonable view of the matter,' he goes on to urge that 'the problem is so important that it should not be left to the opinions of appointees to administrative office. Congress must speak once and for all in regard to the matter.' Explanatory Statement of Senator Curtis, May 14, 1956, introducing S. 3842 to amend § 8(b)(4) to outlaw hot cargo clauses, 102 Cong.Rec. 8022