## MADDEN v. LOCAL 442, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, A. F. L.

### Civ. A. No. 2471.

United States District Court
W. D. Wisconsin.

Sept. 12, 1953.

James F. Foley, Attorney, National Labor Relations Board, Washington, D. C., for petitioner.

John A. Lawton, Madison, Wis., for respondents.

STONE, District Judge.

This cause came on to be heard on the verified petition of Ross M. Madden, Regional Director of the Thirteenth Region of the National Labor Relations Board, for and on behalf of said Board (herein called petitioner), for a temporary injunction against respondent Local 442, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, A.F.L. (herein called Local 442), pending final adjudication of the Board of the matters involved, and upon issuance of an order to show cause why injunctive relief should not be granted as prayed in the petition. Local 442 filed an answer to the petition. A hearing was duly held on June 3, 4 and 5, 1953. The Court has fully considered the petition, answer, evidence, argument and briefs of counsel.

Petitioner is Regional Director of the Thirteenth Region of the National Labor Relations Board.

Local 442, an unincorporated labor organization, is engaged within this judicial district in protecting and promoting the interests of its employee members.

On or about May 7, 1953, Wisco Hardware Company (herein called Wisco) filed with the Board an unfair labor practice charge alleging violations by Local 442 of Section 8(b) (4) (A) of the National Labor

Relations Act, as amended, 29 U.S.C.A. § 141 et seq., herein called the Act.

Said charge was thereafter referred to petitioner as Regional Director of the Thirteenth Region of the Board for investigation, and it was investigated under petitioner's supervision.

After said investigation, petitioner issued a complaint of the Board against respondent pursuant to Section 10(b) of the Act.

Wisco, a corporation, with its principal place of business at Madison, Wisconsin, is engaged in the business of wholesale distribution interstate and locally of general hardware and building materials manufactured outside and within the state of Wisconsin. In the course of said business, Wisco, during the year 1952, purchased building materials, hardware, and supplies of a value in excess of $3,330,000, approximately 75% of which were shipped to Wisco in Wisconsin from points and places outside the state of Wisconsin. During the same period, Wisco sold building materials and hardware of a value in excess of $4,-000,000, approximately 10% of which were shipped to purchasers outside of the state of Wisconsin.

Since or about March 31, 1953, Local 442 and Wisco have been engaged in a primary dispute at Wisco's place of business in Madison, Wisconsin.

Wisco distributes its merchandise to purchasers inside and outside the state of Wisconsin by motor carriers both interstate and intrastate. Only full carload shipments which proceed directly from factory to purchaser are shipped by railroad freight. Wisco's incoming freight is hauled by railroads and by motor carriers.

The motor carriers which haul Wisco's outgoing shipments at the lowest cost and most direct routes are Steffke Freight Co. (herein called Steffke), Wheeler Transportation Co. (herein called Wheeler), Gateway Transportation Co. (herein called Gateway), Robertson Transportation Co. (herein called Robertson), Albrent Freight and Storage Co. (herein called Albrent) and Motor Transport Co. (herein called Motor Transport). Prior to March 31, 1953, these motor carriers, which are interstate carriers operating under authorization from the Interstate Commerce Commission, hauled 90% of Wisco's outgoing freight as well as the major amount of Wisco's incoming freight hauled by motor carriers.

Steffke, Wheeler, Gateway, Robertson, Albrent and Motor Transport have terminals in Madison, Wisconsin, at which outgoing freight is received from shippers and incoming freight is delivered to shippers.

These carriers employ over-the-road drivers who operate vehicles hauling incoming freight from outside the city of Madison to the respective terminals or directly to the consignees' addresses in Madison, and outgoing freight from the respective terminals in Madison or from the consignors' addresses in Madison to the terminals of connecting carriers outside Madison or to the consignees' addresses outside the city of Madison.

These carriers also employ dock workers and local or city drivers. Dock workers load outgoing freight and unload incoming freight. They also move incoming freight from vehicles to designated places of rest on the terminals' docks and move outgoing freight from places of rest on the terminals' docks to vehicles on which it is loaded. Local or city drivers make local pick-ups and deliveries of freight hauled or to be hauled by the respective carriers. At some of these carriers' terminals, local drivers also do the dock work.

The over-the-road drivers, local or city drivers, and dock workers of these said carriers are members of Local 442, and are represented by Local 442 as their collective bargaining representative, except the employees of Motor Transport. These latter employees are presently members of Local 434, which, like Local 442, is affiliated with International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers, A.F.L. (herein called Teamsters). Until the recent opening of Motor Transport's terminal in Madison and the permanent assignment of these employees to this terminal, they were attached to Motor Transport's terminal in Watertown, Wisconsin, and were represented by Local 434, the Teamster's union representing the employees attached to that terminal. The

union membership of these employees will be transferred to Local 442 within the next thirty days. However, Motor Transport's Madison terminal is within the jurisdictional area of Local 442 and not Local 434, and Local 442 determines what action in regard to labor matters employees take at that terminal.

The Central States Area Employers' Association negotiates as to form only collective bargaining contracts governing over-the-road drivers, as agent of Steffke, Wheeler, Gateway, Robertson, Albrent and Motor Transport and other carriers in the central states, with Central State Drivers' Council, a subdivision of Teamsters, as agent of Local 442 and other Locals affiliated with Teamsters. Neither Central States Area Employers' Association nor Central States Drivers' Council has the authority to make any carrier or the International Brotherhood of Teamsters, Chauffeurs, Warehousemen, and Helpers of America, A.F.L. or any of its Locals parties to any contracts negotiated. Such contracts to be binding must be executed by the carriers and by the individual Teamsters' locals which represent the employees of the particular carriers.

Steffke, Wheeler, Gateway, Robertson and Albrent have collective bargaining contracts with Local 442 governing over-the-road drivers for the period February 1, 1952, to January 31, 1955, which are identical with the Central States Area Over The Road Motor Freight Agreement negotiated by the Central States Area Employers Association and the Central States Drivers Council which is Exhibit 3 in evidence. Motor Transport has a similar binding contract with Local 434 of Teamsters.

On January 22, 1953, the Central States Area Employers' Association and the Central States Drivers' Council agreed on an amendment, Exhibit 9 in evidence of Article IX of Exhibit 3 in evidence to be effective on and after January 22, 1953. However, neither Steffke, Wheeler, Gateway, Robertson, Albrent on the one hand and Local 442 on the other executed an amendment to Article IX in their respective contracts. Nor did Motor Transport and Local 434 execute such an amendment

to their contracts. While Exhibit 9 became a part of Exhibit 3, there is no showing that it became a part of the contracts between the said carriers and Local 442 or between Motor Transport and Local 434.

The dock workers and local or city drivers of Steffke, Wheeler, Gateway, Robertson, and Albrent are members of Local 442 and are represented by Local 434, under the same circumstances as are the over-the-road drivers of Motor Transport as described in paragraph (h) above.

A committee known as the Employers' Negotiating Committee negotiates as to form only collective bargaining contracts governing dock workers and local or city drivers as agent of Steffke, Wheeler, Gateway, Robertson, Albrent, Motor Transport and other carriers in Wisconsin, with Wisconsin Conference of Teamsters, as agent of Local 442 and other Locals affiliated with International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, A.F.L. Neither Employers' Negotiating Committee nor Wisconsin Conference of Teamsters has the authority to make any carrier or the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, A.F.L. or any of its Locals parties to any contracts negotiated. Such contracts to be binding must be executed by the carriers and by the individual Teamsters' Locals which represent the employees of the particular carriers.

Steffke, Wheeler, Gateway, Robertson and Albrent have collective bargaining contracts with Local 442 governing dock workers and local or city drivers for the period March 3, 1952 to February 27, 1955, which are identical with the Wisconsin Local Cartage Agreement negotiated by the said Employers' Negotiating Committee and the Wisconsin Conference of Teamsters which is Exhibit 4 in evidence. Motor Transport has a similar binding contract with Local 434.

On or about March 31, 1953, Local 442 went on strike against Wisco and has been on strike against Wisco since that time. At or about that date, Wisco began and has continued until this time to haul its freight to and from the Madison terminals

of the said carriers. Prior to March 31, the employees of these carriers delivered the freight and picked it up at Wisco's place of business but discontinued doing so when Local 442 placed a picket line at the Wisco plant at the beginning of the strike.

When Wisco's drivers pick up and deliver freight at the terminals of the said carriers, they not only load and unload the freight from or to Wisco's vehicles to or from the place on the dock at the tail gate of the vehicles, which is their work, but must also move the freight to or from the designated places of rest on the terminals' docks, because the employees of the said carriers refuse to do this latter work although it is the duty of the carrier's employees to do such work. The refusal to do this work by the carriers' employees commenced when Wisco began hauling its own freight to and from the terminals on or about April 5, 1953, and has continued uninterruptedly regardless whether these employees were at a particular time during April and May, 1953, hauling Wisco's outgoing freight.

On or about May 18, 1953, Local 442 received from the Central States Drivers' Council, Chicago, Illinois, Exhibit 5, which purports to be an interpretation of Article XII of the local cartage agreements (identical with Exhibit 4) between Local 442 and Steffke, Wheeler, Gateway, Robertson and Albrent and between Local 434 and Motor Transport.

On May 18 and 19, 1953, Siewert, Secretary-Treasurer of Local 442 and in charge of Labor Relations for Local 442 at the terminals of motor carriers in Madison, Wisconsin, visited the terminals of Wheeler, Gateway, Steffke, and Robertson and ordered the terminal managers of these carriers to order the employees of these carriers not to haul or handle Wisco's freight. These terminal managers refused to comply with Siewert's order, and continued to refuse to comply with this and similar orders by Local 442. On or about May 20, 1953, Local 442 sent copies of Exhibit 5 to all carriers in Madison with whom it had collective bargaining contracts, announcing thereby that it was on strike at the terminals of these carriers against the handling of Wisco's freight.

On May 23, 1953 Local 442 held a meeting at its union hall which was attended by fifteen to twenty members among whom were employees of Robertson and Gateway. White, business agent of Local 442, who presided at the meeting, told the members present that Local 442 was on strike against the handling and hauling of Wisco's freight by motor carriers, and advised them that they did not have to handle Wisco's shipments if they did not want to. Copies of Exhibit 5 were distributed to union stewards who attended the meeting.

That Chauffeurs & Teamsters Local Union 442 has collective bargaining agreements with certain common carriers operating trucks and terminals in Madison, Wisconsin, as follows: Neuendorf Transportation Company, Steffke Freight Company, Albrent Freight & Storage Co., Inc., Gateway Transportation Company, Motor Transport Company, Robertson Transportation Company, and Wheeler Transportation Company.

That the employers so listed are members of an employers' association which has entered into collective bargaining agreements with said Local 442.

That Article XII of the agreement between said firms and the local union which governs local cartage operations contains the following language:

"It shall not be a violation of this Contract and it shall not be cause for discharge if any employee or employees refuse to go through the picket lines of a Union or refuse to handle unfair goods. Nor shall the exercise of any rights permitted by law be a violation of this Contract.

"The term 'unfair goods' as used in this Article includes, but is not limited to, any goods or equipment transported, interchanged, handled, or used by any carrier, whether party to this Agreement or not, at whose terminal or terminals or place or places of business there is a controversy between such carrier or its employees on the one hand, and a Labor Union on the

other hand; and such goods or equipment shall continue to be 'unfair' while being transported, handled, or used by interchanging or succeeding carriers, whether parties to this agreement or not, until such controversy is settled.

"The Union agrees that, in the event the Employer becomes involved in a controversy with any other Union, the Union will do all in its power to help effect a fair settlement.

"(There shall be a record understanding that, in the event the decision of the National Labor Relations Board in the Conway Case (Rabouin (Conway Express) v. National Labor Relations Board, [2 Cir.] 195 F.2d 906) is sustained or prevails on appeal to the higher Federal courts, this Article will be re-negotiated and rewritten to provide the Union with the maximum of protection afforded by such decision.)"

That said language still remains in effect and has not been amended by the parties.

That Article IX of the Central States Over-the-Road Agreement was originally drafted as set forth in Exhibit 3, which is the Over-the-Road Agreement between Local 442, and the employers listed above in Paragraph 2; that said Article IX was re-negotiated on January 22, 1953, and the negotiators amended said article to read as follows:

"It shall not be a violation of this contract and it shall not be cause for discharge if any employee or employees refuse to go through the picket line of a union or refuse to handle unfair goods. Nor shall the exercise of any rights permitted by law be a violation of this contract. The Union and its members, individually and collectively, reserve the right to refuse to handle goods from or to any firm or truck which is engaged or involved in any controversy with this or any other Union; and reserve the right to refuse to accept freight from or to make pick-ups from or deliveries to estab-lishments where picket lines, strikes, walk-outs or lock-outs exist.

"The term 'unfair goods' as used in this Article includes, but is not limited to, any goods or equipment transported, interchanged, handled, or used by any carrier, whether party to this Agreement or not, at whose terminal or terminals or place or places of business there is a controversy between such carrier or its employees on the one hand, and a labor union on the other hand; and such goods or equipment shall continue to be 'unfair' while being transported, handled or used by interchanging or succeeding carriers whether parties to this Agreement or not, until such controversy is settled.

"The Union agrees that, in the event the Employer becomes involved in a controversy with any other Union, the Union will do all in its power to help effect a fair settlement."

That on or about March 31, 1953, after the strike at Wisco Hardware Company started, the respondent union established a picket line around the premises of said company, which said picket has been maintained continuously to this date.

That truck drivers for each of the trucking companies listed in the first paragraph on page 7 [114 F.Supp. 935] refused to deliver goods to the Wisco Hardware Company because of said picket line.

That the Wisco Hardware Company purchased two trucks and hauled its merchandise to and from the truck terminals and has done so since about the 15th day of April, 1953.

That on or about the 20th day of May, 1953, truck drivers at the various terminals of the trucking companies listed above refused to handle Wisco goods with the result that goods that the Wisco Hardware Company delivered to said terminals, with some exceptions, has not been moved and is lying on the docks; that incoming goods purchased by Wisco Hardware Company are placed on the docks and picked up by the Wisco Hardware Company drivers.

That representatives of the respondent local union visited several of the trucking

companies and requested that they do not handle Wisco goods; that in one instance a strike was threatened if Wisco goods were handled.

That in no case was a strike called by the Chauffeurs & Teamsters Local Union 442 against any of the said carriers.

That the union constitution and by-laws contains no provision compelling a union member to participate in a boycott of unfair goods as defined by the contract provisions set forth above; that said constitution and by-laws provides no penalties should an employee exercise his discretion to handle such goods; that the local union officers, Messrs. White, Siewert, and Bergenske, each make it clear to each of the members that they had conversations with, that the employees had a right to exercise their own discretion in deciding whether or not to handle Wisco goods at the dock terminals.

That the employees of the various common carriers in nearly all instances refused to handle Wisco goods; that this course of conduct continued in various degrees over the period when the strike started until May 24, 1953; that on May 23, 1953, at a meeting of the local cartage drivers which included the employees of the common carriers listed above, Leslie White, business agent of the union, read to the members present at said meeting the language of Article IX of the Over-the-Road Agreement as it was amended by the January 22 negotiations; that the said Leslie White advised the members at said meeting that they should exercise their own discretion as to whether or not they would handle Wisco goods.

That one McCarthy, a union steward at the Wheeler Transportation Company, advised the employees with him on the dock that they should keep their hands off the Wisco goods.

That no employee has been ordered by the union or its officers or agents not to handle Wisco goods, and no employee has been disciplined who did handle Wisco goods.

That no employer took any disciplinary action against employees who refused to handle Wisco goods; that some employers did not protest to the union or to the employees when Wisco goods on their docks were not moved.

It appears from the evidence that the motor carriers' representatives requested their employees to handle Wisco shipments, but no attempt was made by the employers to enforce that request, nor was any employee discharged or disciplined for refusing to handle Wisco freight.

Except as herein stated, the employees of the carriers did not strike except as to Wisco freight, and the business of their employers was not otherwise interrupted or interfered with. They refused to handle Wisco products described under their agreement as "unfair goods", which their employers had agreed they had a right to do. The employer under the terms of the Taft-Hartley Act may discard his neutrality in industrial disputes involving other employers, and in this instance they have done so by entering into the collective bargaining agreement hereinbefore referred to.

The employees, concerned as to what their rights were, and the possibility of their being discharged or disciplined if they refused to handle Wisco freight after the strike was called at the Wisco plant, made inquiries in that respect of union officers.

While there were no formal orders issued by respondents to its members to cease handling Wisco freight, there was an indirect appeal made to them at the union meetings at which they were advised that a strike was on at Wisco and they were told that "they did not have to handle Wisco products if they did not want to", "that under their agreement they could not be disciplined if they refused to handle Wisco freight", "that they did not have to handle Wisco freight to hold their jobs."

■ This activity on the part of the respondent undoubtedly served as an inducement or encouragement to its members to refuse to handle Wisco products. Nevertheless, inasmuch as their employers had by contract consented to the "unfair

goods" provision of the contract, the failure of the employee to handle Wisco shipments was not a strike or concerted refusal to handle Wisco products in the course of their employment, within the meaning of Section 8(b) (4) (A), for that employment defined by the contracts excluded from their required job duties work on "unfair goods". Causing the employees to exercise their contractual privilege, was not an "inducement" to a concerted refusal of the employees to handle Wisco freight in violation of Section 8(b) (4) (A).

In a recent decision, dated June 30, 1953, of the National Labor Relations Board, In the Matter of Chauffeurs, Teamsters, Warehousemen and Helpers Local Union No. 135, affiliated with International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America, A.F.L. and Pittsburgh Plate Glass Company, a case similar in all material respects to the instant case, the Board, interpreting the union's contracts, identical to the one involved in these proceedings, said:

"We believe the 'protection of rights' provision of the contracts herein is in all material respects similar to the 'hot' cargo contracts involved in Conway's Express, Rabouin v. National Labor Relations Board, [2 Cir.] 195 F.2d 906. We agree with the Trial Examiner that the term 'unfair goods' by the language of the provision and the traditional meaning of the phrase, was not limited to the goods of struck carriers but extended to Pittsburgh as well. And the findings above demonstrate that with but one belated exception, the employers herein affirmed the contracts by acquiescing in their enforcement during the period of the Respondent's refusal to handle Pittsburgh's 'unfair goods'. Further, the fact that in Conway the contracts expressly reserved to the union the right to refuse to handle 'hot' goods whereas here the contracts provide that if employees refuse to handle certain goods it shall not be cause for a breach of contract or discharge, does not for us constitute a real difference. As the Board held in Conway's Express,

" 'As they [the secondary employers] consented, their employees' failure to deliver freight to or accept freight from Conway trucks was not in the literal sense a "strike" or "refusal" to work [29] nor was any such concerted *insubordination* contemplated by the [Union] when it caused the employees to exercise their contractual privilege.

"So, as the employers in this proceeding consented to the 'unfair goods' provision of the contracts, their employees' failure to handle these goods was not a strike or concerted refusal to work under section 8(b) (4) (A). Nor was their employees' refusal to handle Pittsburgh freight 'in the course of * * * employment' within the meaning of Section 8(b) (4) (A) for that employment as defined by the contracts excluded from the required job duties work on 'unfair goods'. It cannot be said, therefor, that by causing the employees to exercise their contractual privilege, the Respondent induced a concerted refusal to work in the course of employment with an object of forcing any employer to cease doing business with any other person in violation of Section 8(b) (4) (A). We conclude it matters not that the contracts did not reserve to the Respondent as distinguished from the employees the right to refuse to handle 'unfair goods'.

"The Court of Appeals for the Second Circuit held in affirming the Board's decision in Conway's Express—

" 'Consent in advance to honor a hot cargo clause is not the product of the union's "forcing or requiring any employer * * * to cease doing business with any other person" '.

29. "Section 8(b) (4) (A) proscribed engagement in, or inducement of employees to engage in, 'a *strike* or a *concerted refusal* in the course of their employ-

ment to use, etc. * * *' where an object thereof is: (A) *forcing* or *requiring* any employer to cease doing business with any other person." * * *

"The Board here reaffirms that principle. We therefore find that the Respondent did not violate Section 8(b) (4) (A) of the Act by causing the employees of the various trucking carriers to exercise their contractual privilege of declining to handle Pittsburgh freight. Accordingly, we shall dismiss the complaint."

In line with the foregoing decision of the Board, the Court finds that the respondent did not violate Section 8(b) (4) (A) of the Act by causing the employees of the various trucking carriers to exercise their contractual privileges of declining to handle "unfair goods", the Wisco shipments.

Accordingly: It is hereby ordered that the petition of the National Labor Relations Board be and it is hereby dismissed.

Respondent's counsel may submit proposed findings of fact and conclusions of law to the Court in accordance with the foregoing.