**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, LOCAL 182, UTICA, NEW YORK AND VICINITY, AFL, Respondent.**

No. 169, Docket 23230.

United States Court of Appeals, Second Circuit.

Argued Jan. 5, 1955.

Decided Feb. 2, 1955.

---

2. Mast, Foos & Co. v. Stover Manufacturing Co., 177 U.S. 485, 493, 20 S.Ct. 708, 711, 44 L.Ed. 856.

George J. Bott, David P. Findling, Marcel Mallet-Prevost, Samuel M. Singer and John Francis Lawless, Washington, D. C., for petitioner.

John J. Walsh, Utica, N. Y., for respondent.

Before L. HAND and MEDINA, Circuit Judges, and DIMOCK, District Judge.

MEDINA, Circuit Judge.

In order to shield "unoffending employers and others from pressures in controversies not their own", N. L. R. B. v. Denver Building & Construction Trades Council, 1951, 341 U.S. 675, 692, 71 S.Ct. 943, 953, 95 L.Ed. 1284, the Taft-Hartley Act makes it an unfair labor practice for a union to engage in a secondary boycott. In the language of the statute, Section 8(b)(4)(A) and (B), 29 U.S.C.A. § 158(b)(4)(A) and (B), it is such an unfair labor practice for a labor organization "to induce or encourage the employees of any employer to engage in * * * a concerted refusal in the course of their employment to * * * handle * * * any materials * * * or to perform any services, where an object thereof is: (A) forcing or requiring any employer * * * to cease using * * * handling, transporting, or otherwise dealing in the products of any other producer * * *; (B) forcing or requiring any other employer to recognize or bargain with a labor organization" which has not been certified as the representative of the employees of such "other employer."

The charging party in this proceeding is Jay-K Independent Lumber Corp. of New Hartford, New York, a seller and distributor of lumber and building supplies. Joseph Kelly, president of Jay-K had refused to sign a contract with respondent, the Teamsters Union, unless the employees of Jay-K voluntarily chose the union as their bargaining representative, whereupon, despite the fact that the union had not been certified by petitioner and did not in fact represent a majority of the employees, picketing by the Teamsters commenced. The principal issue before us is whether there is substantial evidence in the record as a whole to sustain the findings of petitioner relative to an incident at the premises of Sunset Lumber Company, millwork and hardwood flooring manufacturers in Lacona, New York, on April 27, 1953.

On the morning of that day John Helbock, a truck driver for Blount Lumber Company of Lacona, left his plant with a truckload of supplies for delivery. He arrived at the premises of Jay-K, noticed a number of automobiles lined up in front and several men standing around, one of whom carried a picket sign. Blount had no contractual relationship with any union, had no labor dispute with the Teamsters and was a complete stranger to the proceedings by which the Teamsters were trying to get Jay-K to sign up. Accordingly, Helbock went about his business, crossed the picket line and placed the hardwood flooring to be delivered to Jay-K on the tailboard of his truck, from which position it was unloaded by employees of Jay-K and taken to the storage sheds. When Helbock was pulling up in front of the building at Sunset Lumber Company, to make his next delivery, he noticed two men who had evidently been following him from Jay-K in an automobile. These men are not identified in the record but the testimony makes it clear that they were members of the Teamsters Union and their mission was to follow Helbock and, in case he sought to make any delivery at a place which was under contract with the Teamsters, to see to it that the union men refused to unload the truck. As the only occasion for such interference was the picket line at Jay-K, which Helbock had crossed, it is quite impossible to escape the conclusion that this pressure on Sunset was to induce the employees of Sunset to refuse to handle materials or perform services with the object of having the pressure passed along to Jay-K and thus forcing it to recognize or bargain with the Teamsters. Sunset had no

labor troubles of any kind; and the fact that its employees were members of the Teamsters Union made it a ready target for the operations of the roving pickets. If what the two men in the automobile said to the employees at Sunset caused the Sunset employees to refuse to unload the Blount truck, this would hurt the business of both Sunset and Blount and might well cause either or both of them to refrain from having further dealings with Jay-K. The intended effect upon Jay-K is too obvious for comment.

■ The evidence of what occurred is simple and quite in accord with the findings and the undisputed fact that when Helbock drove away from the Sunset plant the merchandise intended for delivery to Sunset was still in the truck. The testimony is given by Helbock, Edwin Bielby, the Teamsters' Union steward at Sunset, and "Red" Heinrich, the company's foreman. Bielby saw the two men in the automobile, which had been following Helbock, and one of them, after ascertaining his status and that "the yard was union", told Bielby "You aren't supposed to unload the truck" or "You can't unload the truck." Bielby also testified that he reported to Heinrich that

"these men were following him (Helbock) and told me that we couldn't unload the truck"; also that he told Denslow, a fellow employee at Sunset, "we weren't supposed to unload it." Under these circumstances it is of no significance that Heinrich tried unsuccessfully to telephone to officials of the union and that he gave no specific instructions to unload the truck. As Heinrich testified "there might be some trouble," so "I just let it go by." Doubtless this is precisely what the union expected, or at least hoped, would happen.

■■ Other contentions of respondent may be summarily disposed of. Whether or not the "hot-cargo" clause[1] of the contract between the Teamsters and Sunset is valid,[2] it has no application here, as Sunset was not involved in any labor dispute when the Blount truck incident occurred; and the claim that there was a labor dispute between the Teamsters and Blount as the "primary employer" and that "the truck of Blount was the premises," ascends into the empyrean where the atmosphere is too thin for us.

The order will be enforced.

1. "The Union reserves the right to stop any of its members at any time or under any circumstances from making any pickups, drops or deliveries at any place where labor trouble exists. The Union reserves the right to allow any of its members to handle any merchandise involved in a labor dispute and under no circumstances will any merchandise be allowed to be taken from the plant by any person for forwarding directly or indirectly to any destination where a labor dispute exists."

2. See International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, General Drivers and Helpers Local No. 554, and Chauffeurs, Teamsters and Helpers Local No. 608,

AFL (McAllister Transfer, Inc.), 110 N.L.R.B. No. 224 (1954); International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America Local 294 AFL (Henry Rabouin d/b/a Conway's Express), 87 N.L.R.B. 972 (1949), enforced, Rabouin v. N. L. R. B., 2 Cir., 1952, 195 F.2d 906; Chauffeurs, Teamsters, Warehousemen and Helpers Local Union No. 135, affiliated with International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America AFL (Pittsburgh Plate Glass Co.), 105 N.L.R.B. 120 (1953); Madden v. Local 442, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL, D.C.Wis., 1953, 114 F.Supp. 932.