113 F.Supp. 409 (1953)
MEIER & POHLMANN FURNITURE CO.
v.
GIBBONS et al.
No. 9245.
United States District Court E. D. Missouri, E. D.
June 25, 1953.
Fordyce, Mayne, Hartman, Renard & Stribling, Nelson W. Hartman and Thomas Rowe Schwarz, of St. Louis, Mo., for plaintiff.
Wiley, Craig & Armbruster and Harry H. Craig, of St. Louis, Mo., for defendants Gibbons, Kavner, Latal, Maul, Flynn, Local 688 and Local 600.
Bryan, Cave, McPheeters & McRoberts and William H. Charles, of St. Louis, Mo., for defendant Roadway Express, Inc.
La Tourette & Rebman, B. W. La Tourette and G. M. Rebman, of St. Louis, Mo., for defendants Anderson Motor Service, Inc. and L. A. Tucker Truck Lines, Inc.
Rudolph K. Schurr, of St. Louis, Mo., for defendant Consolidated Forwarding Co.
Max Sigoloff, of St. Louis, Mo., for defendant Be-Mac Transport Co., Inc.
David E. Rosenfeld, of Terre Haute, Ind., for defendant Eastern Motor Express, Inc.
Wilton D. Chapman, of St. Louis, Mo., for defendant New York Central.
Albert E. Schoenbeck, of St. Louis, Mo., for defendant Wabash R. Co.
Watts & Gentry and Herbert E. Bryant, of St. Louis, Mo., for defendant Railway Exp. Agency, Inc.
HULEN, District Judge.
Plaintiff's complaint is in three counts. The first two are for damages. The third is for a permanent injunction to require defendant carriers to furnish it transportation. Under the third count a motion for temporary injunction is now for ruling.
Plaintiff pleads as a base for granting temporary injunction the sole claim that the defendant common carriers and union defendants "have conspired and agreed * * * to discriminate" against plaintiff by refusing to handle plaintiff's shipping requests. Plaintiff's theory of injunctive relief stems from the ruling in Allen Bradley Co. v. Local Union No. 3, 325 U.S. 797, 65 S.Ct. 1533, 1535, 89 L.Ed. 1939.
The record on application for temporary injunction, devoid of matters not material to the issue, is that plaintiff is engaged in a labor dispute and his place of business is being picketed. It manufactures furniture and has used the defendant motor carriers for transportation, including pick-up and delivery at its factory and customer consignees. The motor carriers are common carriers subject to regulation by the Interstate Commerce Commission. One by one defendant motor carriers have refused to handle plaintiff's shipments because the employees of the motor carriers, being members of the same national union as the one that is picketing plaintiff's plant, have served notice on the carriers to that effect. Plaintiff has been forced to use rail service and deliver and call for shipments at rail platform. This adds to plaintiff's costs of *410 operation to the extent of the expense of trucking operations between its factory and the rail platform. Plaintiff is also put at a competitive disadvantage because its customers desire store-door delivery which plaintiff's competitors can furnish and rail carriers do not provide at all points.
The Allen Bradley case arose in New York. The union of electrical workers over a period of years promoted a series of contracts with electrical contractors and manufacturers which included a provision that the contractors were to purchase equipment from none but local manufacturers, who also had closed shop agreements with the unions. Manufacturers obligated themselves to confine their local sales to contractors employing the local members. In the course of time these agreements expanded to industry-wide agreements looking not merely to terms of employment "but also to price and market control." (Emphasis added.) The arrangement was a financial success for the parties to the contracts. Wages went up, prices of electrical equipment soared in New York City to the financial benefit of the local contractors and manufacturers. Some manufacturers even sold their products outside of New York City at a price below the New York City price. The plaintiff was a manufacturer of electrical equipment located outside of New York City. The suit was brought under the Sherman Anti-Trust Act, 15 U.S.C.A. § 1 et seq., to procure an entry to the New York market. The Court held:
"* * * when the unions participated with a combination of business men who had complete power to eliminate all competition among themselves and to prevent all competition from others, a situation was created not included within the exemptions of the Clayton and Norris-La Guardia Acts.
"* * * Seldom, if ever, has it been claimed before, that by permitting labor unions to carry on their own activities, Congress intended completely to abdicate its constitutional power to regulate interstate commerce and to empower interested business groups to shift our society from a competitive to a monopolistic economy. Finding no purpose of Congress to immunize labor unions who aid and abet manufacturers and traders in violating the Sherman Act, we hold that the district court correctly concluded that the respondents had violated the Act.
"Our holding means that the same labor union activities may or may not be in violation of the Sherman Act, dependent upon whether the union acts alone or in combination with business groups."
To state the substance of the facts and holding in the Allen Bradley case is to point the distinction between it and the case here presented. This is not a Sherman Act case. The facts of the Allen Bradley case lent themselves specifically to that Act for the reasons contained in the quoted portions. Assuming without deciding, that similar circumstances as to volume, parties, and territory were present, with application to a transportation industry, that the rule would be the same, plaintiff's claim here must nonetheless fail. The joint action of defendant motor carriers which plaintiff emphasizes, is a labor contract which was negotiated on behalf of the motor carriers by their group representative. This contract terminated a strike which had tied up the operations of the motor carriers. The contract contains a "hot cargo" clause under which employees of the carriers could refuse to handle shipments originating from firms which the unions classified as "unfair." This contract was executed long prior to the commencement of plaintiff's labor and transportation problems. It was a contract forced by the occasion, the result of collective bargaining, under compulsion of a strike.
This record is without evidence of any character that the motor carriers acted in concert with the unions in denying plaintiff transportation. Conspiracy on the part of the carriers with the union cannot be found in the record, even if a suspicion could support such a conclusion. Can anyone be so naive as to suggest the "hot cargo" clause was included in the union contract at the suggestion or by cooperation of the carrier? Do the motor carriers profit as the result of the refusal of their employees *411 to handle plaintiff's shipments? Such refusal causes a dead loss to the motor carriers. It forces plaintiff to use, and plaintiff is using, rail service. Motor carriers derive no revenue from rail carriage. There is not the slightest evidence the furniture industry in the St. Louis area is being affected in its transportation requirements by the motor carrier's failure to carry plaintiff's merchandise. Nor are the motor carriers affected in any substantial way. Certainly they reap no profit or advantage from plaintiff's predicament. As for plaintiff, it still ships its merchandise by freight.
All parties agree that, absent a record showing the case comes within the Allen Bradley ruling, the Norris-La Guardia Act, 29 U.S.C.A. § 101 et seq., bars an injunction by a Federal court in a labor dispute, instituted by a private party, except in certain cases, of which the present contest is not one. Whether plaintiff has a case calling for relief under the Taft-Hartley Act, 29 U.S.C.A. § 141 et seq., can only be ruled on when presented.

Order
Motion of plaintiff for temporary injunction is denied.