233 F.2d 296
 15 P.U.R.3d 99
 MEIER & POHLMANN FURNITURE COMPANY, a Corporation, Appellant,
v.
Harold J. GIBBONS, Individually and as Officer, Agent and
Member, Representative of Warehouse & Distribution Workers'
Union, Local 688, A.F.L., Affiliated with the International
Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers
of America, A.F.L., and all other Members of Said Local
Union, et al., Appellees.
 No. 15402.
 United States Court of Appeals Eighth Circuit.
 April 26, 1956.
Rehearing Denied May 23, 1956.
 
 Thomas Rowe Schwarz, St. Louis, Mo. (Fordyce, Mayne, Hartman, Renard & Stribling, St. Louis, Mo., was with him on the brief), for appellant.
 Gregory M. Rebman and Harold I. Elbert, St. Louis, Mo., for appellees.
 LaTourette & Rebman and Gregory M. Rebman, St. Louis, Mo., were on the brief for appellees Anderson Motor Service, Inc., Hussman & Roper Freight Lines, Inc., Lovelace Truck Service, L. A. Tucker Truck Lines, Inc., and Consolidated Forwarding Co., Inc.
 Thompson, Mitchell, Thompson & Douglas, Edmonstone F. Thompson, and Harold I. Elbert, St. Louis, Mo., were on the brief for appellees Southern Plaza Express Co., Inc., and Interstate Dispatch, Inc.
 T. D. Drury, St. Louis, Mo., was on the brief for appellees Ben Gutman Truck Service, Inc., and Central Motor Freight, Inc.
 Wiley, Craig & Armbruster and Harry Craig, St. Louis, Mo., were on the brief for appellees Harold J. Gibbons and Union defendants.
 Rosenfeld & Wolfe and Robert G. Wolfe, Terre Haute, Ind., LaTourette & Rebman and Gregory M. Rebman, St. Louis, Mo., were on the brief for appellee Eastern Motor Express, Inc.
 Max Sigoloff, St. Louis, Mo., was on the brief for appellee B-Mac Transport Co., Inc.
 Bryan, Cave, McPheeters & McRoberts and William H. Charles, St. Louis, Mo., were on the brief for appellee Roadway Express, Inc.
 Albert E. Schoenbeck, St. Louis, Mo., was on the brief for appellee Wabash Railroad Co.
 Wilton D. Chapman, St. Louis, Mo., was on the brief for appellee New York Central Railroad Co.
 William R. Gentry and Herbert E. Bryant, St. Louis, Mo., were on the brief for appellee Railway Express Agency, Inc.
 Harlan & Harlan and John L. Harlan, St. Louis, Mo., were on the brief for appellee Riss Truck Lines.
 Paxton H. Ackerman, St. Louis, Mo., was on the brief for appellee Pic Freight Co., Inc.
 Before GARDNER, Chief Judge, and WOODROUGH and VAN OOSTERHOUT, Circuit judges.
 VAN OOSTERHOUT, Circuit Judge.
 
 
 1
 This is an appeal from final judgment dismissing on its merits the action of Meier & Pohlmann Furniture Company, a Corporation, plaintiff below and appellant here, against two railroads, a pick-up and delivery service under contract with the railroads, one express company, thirteen motor carriers, two local unions, one international union, and one union official. For convenience we will generally refer to the parties as plaintiff and defendants.
 
 
 2
 Plaintiff was engaged in the furniture manufacturing business in St. Louis, Missouri. Labor trouble developed between the plaintiff and its employees represented by the Upholsterers' Union, not a party to this action, which ripened into a strike in February 1952. It is stipulated that such strike was a legal one in the sense that it was called by a union certified by the National Labor Relations Board as bargaining agent for certain of plaintiff's employees. The strikers set up a picket line. The facts bearing upon the issue of violence on the picket line will be developed hereinafter. After the institution of the strike at plaintiff's plant, it became increasingly difficult for plaintiff to get transportation service at its plant, particularly pick-up and delivery service. Such service tapered off until in the spring of 1953 pick-up and delivery service became practically unavailable. Since the termination of the strike in June of 1954, plaintiff has had no transportation or labor problems. During the strike period, save a few minor exceptions, the carrier defendants have handled outgoing and incoming freight and express shipments for plaintiff where outgoing shipments were delivered to the carriers' docks or stations and incoming items were received at such docks or stations.
 
 
 3
 Plaintiff's petition is in four counts. In Count I plaintiff seeks damages for business loss claimed to have resulted from failure of the carriers to furnish transportation, particularly pick-up and delivery service, charging all defendants had illegally conspired to and did discriminate against plaintiff by failing to render transportation service generally provided to shippers, thereby violating the duties imposed upon the carriers by 49 U.S.C.A. §§ 1 and 316(b). In Count I-a the plaintiff eliminates the conspiracy charge, and seeks damages for the same injury against all defendants, based upon the individual wrongful action of such defendant. Count II complains of a secondary boycott by the union defendants, charging violations of 29 U.S.C.A. § 187, and seeks damages against the union defendants. Count III is for injunctive relief, asking that the defendants be required to furnish plaintiff transportation service.
 
 
 4
 The defendants have filed separate answers which vary as to contents. All defendants deny the conspiracy charge, and each denies that the plaintiff has stated a cause of action against the answering defendant. Defendants, New York Central and Wabash, assert that because of the strike and the picket line they are excused from performing pick-up and delivery service by the pick-up and delivery tariff in effect, providing in part as follows:
 
 
 5
 'Nothing in this tariff shall require the carrier to perform pick-up or delivery service at any location from or to which it is impracticable, through no fault or neglect of the carrier, to operate vehicles because of:
 
 
 6
 '(C) Any riot, strike, picketing or other labor disturbance.'
 
 
 7
 The motor carriers assert that they are excused from furnishing pick-up and delivery service by their impracticable delivery tariff, substantially the same as the one pertaining to the railroads just set out. In addition, the motor carriers allege that they have a labor contract with their employees containing, among other things, union shop and picket line clauses.
 
 
 8
 Because of the voluminous pleadings and the variations in the defenses asserted, we deem it advisable to set out verbatim plaintiff's contentions in its brief as to the issues raised. Plaintiff states:
 
 
 9
 'The issues upon trial became:
 
 
 10
 'a. Was the refusal of the carriers and their employees or agents to provide pickup and delivery service and in some cases other transportation service, an unjust discrimination in violation of the Interstate Commerce Act and the Motor Carriers Act?
 
 
 11
 'b. Was the request of the plaintiff for service reasonable within the meaning of these acts or did the Impractical Operations Tariff Rule (where applicable) excuse the carriers from serving plaintiff?
 
 
 12
 'c. Did the written contracts between the carriers and their employees and agents (entered into as described in the evidence) providing that the employees could refuse to cross picket lines or perform work in an instance in which a picket had been established and which prohibited the carriers from employing others to do the work, excuse the rendition of service or when considered with the other actions of the defendants to a conspiracy not to render the service at the unions' discretion?
 
 
 13
 'd. Did the participation of those carriers (Wabash, New York Central and Railway Express Agency) who had no written contract provisions to the effect described in (c) above in the general program with the unions, sufficiently join them to the union induced plan of discrimination to make them co-conspirators?
 
 
 14
 'e. Did the activities of the unions in connection with the inducement of employee refusal to serve Plaintiff amount to a violation of the Labor Management Relations Act, in particular 29 U.S.C.A. Sec. 187?
 
 
 15
 'f. Did the entry into such agreements by the carriers with their employees restrict the freedom of the carriers to establish reasonable and just practices and, if so, whether the enforcement of such agreements should be enjoined?'
 
 
 16
 For convenience we will treat the issues raised by the plaintiff under the following headings and in the order here stated:
 
 
 17
 1. c and d, Conspiracy Issue.
 
 
 18
 2. a and b, Impracticable Operation Issue.
 
 
 19
 3. e, Boycott Issue.
 
 
 20
 4. f, Injunction Issue.
 
 
 21
 This case was tried to the court without a jury. Our scope of review is prescribed by Rule 52, Federal Rules of Civil Procedure, 28 U.S.C.A. The finding of fact of a trial court may not be set aside unless there is no substantial evidence to support it, unless it is against the clear weight of the evidence, or unless it was induced by an erroneous view of the law. Pendergrass v. New York Life Ins. Co., 8 Cir., 181 F.2d 136, 137. The trial court had jurisdiction under 49 U.S.C.A. §§ 9 and 319, and 28 U.S.C.A. §§ 1331 and 1337. We have jurisdiction under 28 U.S.C.A. § 1291.
 
 
 22
 We shall now proceed to consider the plaintiff's contentions.
 
 
 23
 1. Conspiracy Issue.
 
 
 24
 Plaintiff claims that all defendants entered into and carried out a conspiracy to deprive the plaintiff of normal transportation facilities. Plaintiff relies upon the evidence that all motor carriers entered into contracts with their employees which included a picket line clause, contending that such a picket line clause is illegal in that it disabled carriers from performing their statutory transportation duty; and that ultimately during the progress of the strike at plaintiff's plant all carriers, including the railroads, stopped pick-up and delivery service at plaintiff's plant. The picket line clauses in the various contracts between the motor carriers and their employees vary slightly, but all provide in substance that it will not be a violation of the labor contract or cause for discharge of an employee for an employee to refuse to cross a picket line that has been legally authorized.
 
 
 25
 The Labor Management Relations Act specifically recognizes the right of an employee to refuse to cross a picket line legally established against an employer other than his own. 29 U.S.C.A. §§ 158(b)(4), 187, and 187(a). The Supreme Court speaks of the sections just cited in National Labor Relations Board v. Rockaway News Supply Co., Inc., 345 U.S. 71, at page 80, 73 S.Ct. 519, at page 524, 97 L.Ed. 832 , as follows:
 
 
 26
 'In the section by which the Labor Management Relations Act prescribes certain practices of labor organizations which shall be deemed unfair, there is a proviso that nothing therein 'shall be construed to make unlawful a refusal by any person to enter upon the premises of any employer (other than his own employer), if the employees of such employer are engaged in a strike ratified or approved by a representative of such employees whom such employer is required to recognize under this Act * * *.' This clearly enables contracting parties to embody in their contract a provision against requiring an employee to cross a picket line if they so agree. * * *'
 
 
 27
 It seems clear that a picket line clause in a contract is entirely legal so far as the Labor Management Relations Act is concerned. There is nothing in such Act which states its provisions are not applicable to motor carriers, neither is there anything in the Motor Carriers Act with directly a picket line clause. We can find no reason why the parties, if they so choose, cannot validly insert a picket line clause in their labor contract. It would not necessarily follow that the insertion of such a clause would prevent a strikebound plant from making a reasonable request for transportation service, or that the refusal by an employee protected by a picket line clause to cross a picket line would furnish the carrier a defense under an impracticable operation clause. However, the fact that the Interstate Commerce Commission approves an impracticable operation tariff of the type hereinabove quoted would seem to have some bearing on the reasonableness, as a matter of public policy, of permitting such a clause in a labor contract involving transportation.
 
 
 28
 In Montgomery Ward & Co., Inc., v. Consolidated Freightways, Inc., 42 I.C.C. 225 (M.C.C.), the Commission construed an impracticable operation tariff quite similar to, but not quite as broad as, the one before us in this case. Montgomery Ward filed a complaint with the Commission against thirteen motor carriers, alleging failure to furnish transportation and pick-up and delivery service, claiming that such conduct was unlawful and discriminatory, and asking that the carriers be ordered to cease and desist from such violations of their duty. The carriers' employees, in compliance with the rules of their union, refused to cross the picket line. The complainant contended that the carriers made no real effort to service the plant after the picketing, that the fear of a strike by the carriers of their own employees was mere conjecture, and that no effort had been made to employ nonunion labor to operate the trucks. The Commission dismissed the complaint, stating that because of the strike at the complainant's plant and the refusal of the carriers' employees to cross the picket line, the carriers were physically prevented from serving Montgomery Ward, and accordingly their conduct was within the limitations and conditions of the applicable tariff with respect to impracticable operation and not unlawful. A contrary result was reached by the United States District Court for the District of Oregon in a case arising out of substantially the same facts as the case before the Commission. See Montgomery Ward & Co., Inc. v. Northern Pacific Terminal Co., D.C., 128 F.Supp. 475.
 
 
 29
 We have serious doubt whether the parties to the labor contracts involved in our present case engaged in an unlawful act in negotiating the labor contracts that were signed. In any event we agree with the conclusion of the trial court that the plaintiff has failed to carry its burden of proof on the conspiracy issue, whether or not the picket line clause is illegal. The motor carriers who entered into the contracts containing the picket line clause did so because of economic pressure exerted upon them, and for the purpose of stopping and preventing strikes against them by their own employees. The employers were by law compelled to bargain collectively with their employees. It is a common and approved practice for negotiations to settle labor controversies to be worked out by joint committees representing industry and labor. There was nothing illegal or unusual in the circumstance that the terms of the contract, which covered many other matters in addition to the picket line clause, were worked out by joint committees representing capital and labor. It should be noted that the railroads, the express company, and Gutman did not participate in any such negotiations, and that the railroads do not have any picket line clause in their contracts. There is nothing in the record whatever to tie in the railroads or the express company with the negotiation of the motor carriers' labor contracts.
 
 
 30
 The labor contracts containing the picket line clause were entered into long before the strike at plaintiff's plant occurred. It can not be fairly inferred from the record that the motor carriers by agreeing to the picket line clause had any intention of curtailing their transportation service to the plaintiff or to anyone else. Moreover, the manner in which the pick-up and delivery service was discontinued after the picket lines were set up negatives any idea of preconceived conspiracy. The pick-up and delivery services afforded by the carriers did not cease at the same time. Some such services were furnished by some of the carriers until the spring of 1953, or more than a year after the commencement of the strike. Some carriers managed to get into the plant, and others parked trucks for unloading at the curb just outside the picket line. A number of the defendants continued to attempt the deliveries from time to time throughout the period of the strike.
 
 
 31
 Under this record we do not believe the actions of the various carriers in the cessation of the deliveries can be considered parallel. However, if so considered, the mere proof of parallel behavior does not conclusively establish that such behavior was induced by unlawful agreement. Theatre Enterprises, Inc. v. Paramount Film Distributing Corp., 346 U.S. 537, 74 S.Ct. 257, 98 L.Ed. 273. See Pevely Dairy Co. v. United States, 8 Cir., 178 F.2d 363. In the Theatre Enterprises case, the Court, in considering the evidence bearing on the issue of conspiracy, states 346 U.S. at page 540, 74 S.Ct. at page 259:
 
 
 32
 'The crucial question is whether respondents' conduct toward petitioner stemmed from independent decision or from an agreement, tacit or express. * * *'
 
 
 33
 In our present case, upon the record made, a finding that the stoppage of services stemmed from the individual decision of the carrier defendants, rather than as the result of any concerted or planned action, is warranted.
 
 
 34
 We are convinced that the finding of the trial court that the defendants did not enter into a conspiracy is not clearly erroneous.
 
 
 35
 2. Impracticable Operation Issue.
 
 
 36
 The railroads and motor carriers involved in this action were engaged in interstate commerce and were operating under authority granted by the Interstate Commerce Commission. Such railroads and motor carriers are obligated to furnish transportation upon reasonable request therefor at fair rates and without discrimination. 49 U.S.C.A. § 1 and 316.
 
 
 37
 Plaintiff contends that each defendant is individually liable for damages to plaintiff occasioned by the failure of each individual defendant to carry out its obligation to furnish transportation. It is clear very little pick-up and delivery service was afforded plaintiff during the period from the spring of 1953 until the end of the strike and the withdrawal of pickets in June of 1954. Between the time of setting out the pickets in February 1952 until the spring of 1953 some such service was afforded, but such service gradually declined as the carriers' employees encountered resistance and refused to cross the picket lines. Defendant carriers contend that they were excused from rendering pick-up and delivery service by reason of the impracticable operation tariff hereinabove set out.
 
 
 38
 Questions as to the reasonableness of rules, regulations, and tariffs are for the Interstate Commerce Commission, and until found unreasonable by it, a shipper may not maintain an action in any court against a carrier upon the claim that any rule or regulation is unreasonable and that through its enforcement it has sustained loss or damage. Baltimore & Ohio R. Co. v. Brady, 288 U.S. 448, 456, 53 S.Ct. 441, 77 L.Ed. 888; Pennsylvania R. Co. v. Puritan Coal Mining Co., 237 U.S. 121, 131, 35 S.Ct. 484, 59 L.Ed. 867. However, when the validity of the rule is not attacked, a shipper may bring an action in the courts grounded upon its violation or discriminatory enforcement. Here, the plaintiff admits the validity of the tariff regulation, and then states in its brief:
 
 
 39
 'To interpret the impracticable operation tariff to permit carrier refusal to serve in these cases upon the mere appearance of a picket line would give it a meaning in violation of and contrary to the purposes of the act, whereas to interpret it to mean that when a strike or picket line exists at a shipper's plant the carrier may responsibly evaluate that condition objectively in the light of possible harm to his property or employees in determining the reasonableness of the shipper's request for shipment is to give it a proper and legal meaning.' We are here concerned with the construction and interpretation of the tariff, not with the question of its validity.
 
 
 40
 Although pick-up and delivery service was developed by railroads subsequent to the establishment of station to station service and the history of the development of this supplementary service is discussed in the briefs and by the trial court, we doubt whether this history has any important bearing on the issues confronting us. Pick-up and delivery service comes within the definition of 'transportation' as contained in 49 U.S.C.A. § 1(3) as to railroads, and § 303(a)(19) as to motor carriers, and consequently such service is subject to regulation by the Commission.
 
 
 41
 The trial court, in holding that the carriers were excused from furnishing the pick-up and delivery service, places considerable reliance upon this court's decision in Minneapolis & St. Louis Ry. Co. v. Pacific Gamble Robinson Co., 8 Cir., 215 F.2d 126. In that case a shipper sued for damages occasioned by the railroad's failure to furnish it with cars on a siding adjacent to its plant. The issue was whether under the circumstances of that case plaintiff's request for transportation was reasonable within the meaning of 49 U.S.C.A. § 1(4). A legal strike was in progress against the shipper. The railroad employees refused to cross the picket line. The evidence on the presence and danger of violence on the picket line was in dispute. This court held that there was evidence to support the finding of the trial court that the shipper's request for cars was reasonable, although it is conceded in the opinion that there would have been sufficient evidence to support a contrary conclusion by the finder of facts. The test laid down for determining whether the shipper's request is reasonable is thus stated, 215 F.2d at page 132:
 
 
 42
 'The existence of a strike against a shipper-- at least where, as here, there is involved no contractual tie, or other specific community of labor interest, between the unions of the carrier's employees and the shipper's employees, by which the actions of the carrier's employees are controlled-- is, in its carrier aspect, simply a condition in the shipper's situation, which, like any other special obstacle or difficulty of abnormal shipper-situation, the carrier has the right to responsibly evaluate, on all its elements, as a question of whether the situation thus fairly constitutes the shipper's demand for service from the carrier as one of 'reasonable request' under the statute.'
 
 
 43
 It is clear from the Pacific Gamble Robinson decision that an employer is not required to subject his employees to risks of injury or harm, the court stating, 215 F.2d at page 132:
 
 
 44
 '* * * It would hardly be a reasonable request for carrier service, for a shipper to demand in effect, by virtue of that result necessarily being inherent in any attempted compliance, that a railroad require its employees to spill their blood in his existing strike situation, or that it compel them to subject themselves and their families to a real and substantial danger of retaliatory bodily harm in their outside life from his striking employees.'
 
 
 45
 In our present case the trial court made the following findings:
 
 
 46
 'During the existence of the picket line there was some violence, peace disturbance, profanity, attempt to crowd a truck to the curb, the following of 'strike-breakers', and one person was stabbed. These matters were given newspaper publicity. Some of the carriers' employees crossed the picket line to provide pick-up and delivery service. Some attempted to give the service by making deliveries at the curb adjacent to plaintiff's factory. Defendant Roadway Express, Inc. had a walkout of its own employees when it threatened to discharge one for failure to cross the picket line.'
 
 
 47
 In the course of the opinion the trial court states:
 
 
 48
 'With these conditions facing the carriers they were compelled to weigh the damage to commerce in general against an attempt, with no assured success, of furnishing to plaintiff a service that was a convenience at times, but the lack of which did not prevent plaintiff from moving its goods in commerce. It might have been more courageous-- it might have been more pleasing to plaintiff-- had the carriers elected to do battle on the picket line at plaintiff's factory. But we believe when seventeen carriers, defendants here and all other carriers which serve St. Louis and are not defendants here, elect to follow the same course, over a period of time, that the very number of carriers so acting is substantial evidence that the operation of which plaintiff complains was impracticable and substantial evidence that the carriers were acting in a reasonable and prudent manner.'
 
 
 49
 Such findings and conclusions of the trial judge are fully supported by the evidence. Plaintiff, in its petition for injunctive relief filed July 14, 1952, alleges thirty-three acts of violence or threats thereof during the period from February 10 to June 10, 1952. An injunction was granted on July 24, 1952, enjoining mass picketing and acts of violence against plaintiff, its employees, customers, and transportation agencies. The fact that this injunction was outstanding was a factor to consider in evaluating the evidence on violence and the danger thereof. A similar injunction was in effect in the Pacific Gamble Robinson case. Plaintiff, in its motion to enlarge the injunction, filed on December 23, 1953, alleges the continuance of violence, threats, and bodily harm on the picket line, and the obstruction of ingress and egress to plaintiff's premises. In said motion the plaintiff states:
 
 
 50
 '5. Picketing by defendants, their agents, representatives, servants and employees, of the place of business operated by plaintiff is so entwined and enmeshed with violence, threats thereof, and other similar and related unlawful conduct of defendants, their agents, representatives, servants and employees, occurring on the picket line and at other places, has rendered it impossible for the plaintiff to properly operate its business, and said unlawful conduct has continued, despite the issuance of the Court's decree herein, temporarily enjoining such unlawful conduct.'
 
 
 51
 In the record are also two petitions of plaintiff for a show cause order, alleging violations of the injunction, one being based on the severe stabbing of an employee, and the other being based on threats of violence and the blocking of a driveway to plaintiff's premises on September 5, 1953. Arthur John Meier, plaintiff's president and general manager, testified in part:
 
 
 52
 'From July, 1952, to December, 1953, the 'picketing varied to such a degree that you couldn't tell' one day where it was love and roses for a month or a week when all of a sudden it would flare up. It would appear to us a flare-up would occur whenever a new man would come around and either he joined up-- I recall one particular instance where the report came to us of a gun being in evidence, that being submitted through one of our foremen's reports. We reported that to the police, it is a matter of record. It would die down for several days or a week, then somebody would get all heated up. A temporary restraining order was issued on July 24, 1952. Even after the issuance of the temporary restraining order the picketing union refused to comply with the terms of the order and continued with their violence, threats, coercion and intimidation.'
 
 
 53
 There is additional testimony bearing on the violence issue, but we believe that the evidence hereinabove set out affords ample support for the court's findings as to violence.
 
 
 54
 The Pacific Gamble Robinson case involved the determination of the issue of when a request for transportation was reasonable, and did not involve the construction of an impracticable operation tariff such as we are considering here. However, we are convinced that evidence which would be sufficient to warrant a denial of transportation on the basis that the request was not reasonable would be ample to support an excuse for failure to provide service under the impracticable operation tariff.
 
 
 55
 An appraisal of the evidence here, upon the basis of the tests prescribed in the Pacific Gamble Robinson case, leads us to the conclusion that the trial court was warranted in finding that the defendant carriers were excused under the impracticable operation tariff from performing the pick-up and delivery service to which the plaintiff here claims it was entitled.
 
 
 56
 Because of the foregoing conclusion we do not reach the question of whether a proper construction of the impracticable operation tariff would excuse performance by the carriers if only peaceful picketing had been present or had been involved.
 
 
 57
 The impracticable operation tariff provides for a special charge for pick-up and delivery service. Such charge is refunded by the carrier if the service is not used. The plaintiff has collected all such refunds due it.
 
 
 58
 There were a few instances in which over-the-road service was not provided by certain motor carriers. This consisted of an embargo by Roadway Express from September 9, 1953, and a refusal by Tucker to handle merchandise from Cape Girardeau to St. Louis. Such transportation was taken care of by other carriers. The over-the-road service is not covered by the impracticable operation tariff, but such service could be refused in the event the evidence established that the request for service was not reasonable. The trial court concluded that the only damage caused by these failures to furnish over-the-road service would be the damage sustained by the plaintiff in the loss of pick-up and delivery service.
 
 
 59
 We agree with the trial court that the plaintiff has not established any individual liability against the carrier defendants, and that no liability has been established against the union defendants unless it should be upon the basis of boycott, which issue we will hereinafter discuss.
 
 
 60
 3. Boycott Issue.
 
 
 61
 Plaintiff seeks damages against the unions and the union representative on the basis that such defendants induced and encouraged their union members who were employees of the motor carrier defendants to engage in a concerted refusal to provide plaintiff with transportation facilities, and that such conduct rendered said unions and union representative liable to the plaintiff for damages it incurred by reason of the loss of transportation facilities. Such damages are claimed under 29 U.S.C.A. § 187(a)(4) and (b) which provides:
 
 
 62
 ' § 187. Boycotts and other unlawful combinations; right to sue; jurisdiction; limitations; damages
 
 
 63
 '(a) It shall be unlawful, for the purposes of this section only, in an industry or activity affecting commerce, for any labor organization to engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services, where an object thereof is--
 
 
 64
 * * * * * *
 
 
 65
 '(4) * * * Nothing contained in this subsection shall be construed to make unlawful a refusal by any person to enter upon the premises of any employer (other than his own employer), if the employees of such employer are engaged in a strike ratified or approved by a representative of such employees whom such employer is required to recognize under subchapter II of this chapter.
 
 
 66
 '(b) Whoever shall be injured in his business or property by reason or (of) any violation of subsection (a) of this section may sue therefor in any district court of the United States subject to the limitations and provisions of section 185 of this title without respect to the amount in controversy, or in any other court having jurisdiction of the parties, and shall recover the damages by him sustained and the cost of the suit.'
 
 
 67
 29 U.S.C.A. § 158(b)(4), using the same language, makes a secondary boycott an unfair labor practice. This statutory law 'restricts a labor organization and its agents in the use of economic pressure where an object of it is to force an employer or other person to boycott someone else.' National Labor Relations Board v. Denver Building & Construction Trades Council, 341 U.S. 675, 687, 71 S.Ct. 943, 951, 95 L.Ed. 1284.
 
 
 68
 It is to be noted that the foregoing statutes proscribed secondary boycott activities only by labor organizations. The prohibition does not extend to individual members of such organizations or to the employer.
 
 
 69
 The trial court dismissed the secondary boycott count stating:
 
 
 70
 'A complete answer to plaintiff's claim under Count II can be found in its failure to carry the burden of proving union action or concert of action to deny plaintiff pick-up and delivery service, and the absence of a basis for recovery under Count I(A) is the legality of the picket line clause in the labor contracts in issue.
 
 
 71
 'We can find no substantial evidence of concert of action by the unions as charged. Rather the record shows a pattern of individual action and group action co-extensive with the employees of each carrier or carriers. This is reflected in the passage of several months before all carriers were failing to furnish the plaintiff pick-up and delivery service. It is further evident in the conduct of some carrier employees crossing the picket line.'
 
 
 72
 The union activity was the subject of a pre-trial stipulation which is incorporated in full in the trial court's findings, and is summarized in the court's opinion as follows:
 
 
 73
 'The activity of the union, as we view the record, extended to telling their men they did not have to cross the picket line at plaintiff's factory under their contracts with the carriers.'
 
 
 74
 There is some evidence to support the plaintiff's contention on this issue. The trial court had the benefit of hearing and observing the witnesses. Upon appeal the evidence must be viewed in the light most favorable to the prevailing party. We cannot say that the trial court's findings on this issue are not based on substantial evidence or are clearly erroneous. Moreover, we have heretofore found for defendants on the impracticable operation issue on the basis that the evidence supports a finding that pick-up and delivery service by the carriers was excused by reason of violence and threatened violence on the picket line. Such finding and the evidence supporting it could well afford the basis for an inference that the violence and threats thereof on the picket line were the inducing cause for the refusal of the carriers' employees to cross the picket line.
 
 
 75
 What has heretofore been said requires an affirmance of the trial court's dismissal of the claim based on secondary boycott. We pretermit consideration of the controversial issue of whether the rule announced in In re Conway's Express, 87 N.L.R.B. 973, affirmed sub nom. Rabouin v. National Labor Relations Board, 2 Cir., 195 F.2d 906, 912, to the effect that 'Consent in advance to honor a hot cargo clause is not the product of the union's 'forcing or requiring any employer * * * to cease doing business with any other person", should be followed. A majority of the Board has repudiated the rule announced in the Conway case. See McAllister Transfer, Inc., 110 N.L.R.B. 1769; Sand Door case, 113 N.L.R.B. No. 123.
 
 
 76
 4. Injunction Issue.
 
 
 77
 The trial court, with reference to the injunction issue states:
 
 
 78
 'Count III for injunctive relief is now moot as all carriers are now furnishing service without complaint as to its character by plaintiff.'
 
 
 79
 The evidence conclusively establishes that the plaintiff has had no transportation problem since June of 1954, and there is nothing in the record to indicate that plaintiff's transportation problem is likely to recur. We have affirmed the trial court's findings and conclusion upon the other issues involved in this case. We are convinced that the trial court did not abuse its discretion in dismissing plaintiff's claim for injunctive relief.
 
 
 80
 The motion to tax costs of the supplemental record to the plaintiff, filed by the defendants, is sustained, and such costs will be taxed to plaintiff.
 
 
 81
 The judgment appealed from is affirmed.