GENERAL DRIVERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS UNION, LOCAL NO. 886, AFL–CIO, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

LOCAL 850, INTERNATIONAL ASSOCIATION OF MACHINISTS, AFL–CIO, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

Nos. 13394, 13406.

United States Court of Appeals District of Columbia Circuit.

Argued Jan. 11, 1957.

Decided May 9, 1957.

Mr. Herbert S. Thatcher, Washington, D. C., for petitioner Gen. Drivers, Chauffeurs, Warehousemen and Helpers Union, Local No. 886.

Mr. Louis P. Poulton, Pasadena, Md., of the bar of the Supreme Court of Maryland, pro hac vice, by special leave of Court, with whom Mr. Plato E. Papps, Washington, D. C., was on the brief, for petitioner Internat. Assn. of Machinists, Local No. 850.

Mr. Norton J. Come, Atty., N. L. R. B., with whom Mr. Marcel Mallet-Prevost, Asst. Gen. Counsel, N. L. R. B., was on the brief, for respondent.

Before PRETTYMAN, WASHINGTON and BASTIAN, Circuit Judges.

BASTIAN, Circuit Judge.

These cases involve the issue as to whether or not the so-called "hot cargo" clause [1] in a labor contract, wherein an employer agrees that his employees shall not be required to handle struck goods, is enforceable by the union party thereto, and whether it (the hot cargo clause) may be used as an excuse by a union on strike to conduct secondary picketing.

The facts found by the Trial Examiner and the majority of the National Labor Relations Board are substantially as follows:

Local 850, International Association of Machinists (hereinafter called Machinists) became involved in an economic strike with the American Iron & Machine Works Company (hereinafter called American Iron) in September 1954. The strike lasted a little over a month, terminating upon the execution of a new collective bargaining agreement. During the course of the strike the Machinists picketed the three plants of their employer. They also picketed trucks of American Iron when they appeared at the loading platforms of certain carriers. Representatives of General Drivers, Chauffeurs, Warehousemen and Helpers Union, Local 886 (hereinafter called Teamsters) instructed the unloading personnel of the carriers that, under the terms of the hot cargo clause of

---

1. The "hot cargo" clause in question reads: "(a) The Union and the Employer agree that it shall not constitute a breach of this Agreement for any employee or Union member covered herein to refuse to cross a picket line or to refuse to enter upon the premises of an Employer if such refusal does not constitute a violation of the Labor Management Relations Act of 1947. (b) Members of the Union shall not be allowed to handle or haul freight to or from an unfair company, provided, this is not a violation of the Labor Management Relations Act of 1947."

the contract between Teamsters and the carriers, the employees were not to handle American Iron goods since they were struck goods. Certain of the carriers, despite the hot cargo clause, requested their employees to handle American Iron goods, whereupon Teamsters urged its members employed by those carriers to refuse to handle these goods. One carrier-employer took no action and did not request his employees to unload.

On charges filed by American Iron, the National Labor Relations Board (hereinafter called the Board) issued complaints, filed two days after the new contract between American Iron and Teamsters was signed, against both Teamsters and Machinists by reason of the alleged violation of Section 8(b) (4) (A) of the National Labor Relations Act, as amended.[2] A temporary injunction applied for by the Board was denied by the United States District Court for the Western District of Oklahoma.

The complaints of the Board were referred to a Trial Examiner and, after a preliminary report and consideration of the exceptions thereto, the Board, by a majority vote, two of the five members dissenting, directed that Machinists and Teamsters cease and desist from inducing or encouraging the employees of the carriers, or any other employer, to engage in a strike or concerted refusal in the course of their employment to work on or handle freight consigned to or received from American Iron, or any other employer, where an object thereof was to force or require any employer or person to cease doing business with American Iron. Two of the three members of the majority of the Board were of opinion that the hot cargo clause was valid; the third member, concurring in the result of the Board's order, was of opinion that the clause was illegal and did violence to Section 8(b) (4) (A). The two Board members comprising the majority held in effect that, even assuming that the Act itself does not prohibit the execution of a "hot cargo" clause, nevertheless, the Act does preclude enforcement of such a clause by appeals to employees.[3]

From the order of the Board, Teamsters and Machinists filed these petitions asking this court to review and set aside the order; and, in its answer to the petitions, the Board requested that its order be enforced.

2. 61 Stat. 141 (1947): "(b) It shall be an unfair labor practice for a labor organization or its agents * * * (4) to engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services, where an object thereof is: (A) forcing or requiring any employer or self-employed person to join any labor or employer organization or any employer or other person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person * * *." 29 U.S.C.A. § 158(b) (4) (A).

3. The exact language of the Board's ruling is as follows: " * * * any direct appeal to employees by a union to engage in a strike or concerted refusal to handle a product is proscribed by the Act when one of the objectives set forth in Section 8(b) (4) (A) is present. Thus, while Section 8(b) (4) (A) does not forbid the execution of a hot cargo clause or a union's enforcement thereof by appeals to the employer to honor his contract, the Act does, in our opinion, preclude enforcement of such clause by appeals to employees, and this is so whether or not the employer acquiesces in the union's demand that the employees refuse to handle 'hot' goods. Accordingly, in affirming the Trial Examiner, we do not find it necessary to rely as he did, on the fact that the secondary employers herein did not acquiesce in the refusal of their employees to handle American Iron's freight. In our view, it is sufficient that there was direct inducement of such employees by Teamsters not to handle such freight, with an object of forcing the secondary employers to cease dealing with American Iron."

## I

### Appeal in No. 13,394

Petition of General Drivers, Chauffeurs, Warehousemen and Helpers Union, Local No. 886

 We agree with the four members of the Board who held that the hot cargo clause of the contract was not violative of the provisions of Section 8(b) (4) (A) of the Act. This seems also to have been held by the Second Circuit in the socalled Conway case.[4] The majority of the Board held, following Sand Door & Plywood Co., 113 N.L.R.B. No. 123, that any direct appeal to employees by a union to engage in a strike or concerted refusal to handle a product is proscribed by the Act when one of the objectives set forth in Section 8(b) (4) (A) is present. See note 3, supra.

With this we disagree. If the hot cargo clause is not violative of Section 8 (b) (4) (A), and we think it is not, such a ruling would in practical effect render nugatory the clause itself and would leave the employees without adequate remedy. The Board urges that Section 8 (b) (4) (A) was enacted for the benefit of the public. We think that, although the public is involved, this section has for its purpose the protection of those persons who might be subjected to a secondary boycott, which is proscribed by the section.

We are not impressed with the argument that other adequate remedies are open to the employees of the union. Such remedies as are suggested by the Board seem to us to be totally inadequate and not such as are contemplated by the agreement by the employer in the hot cargo clause.

Here the Teamsters' conduct only consisted of urging the employees of the carriers not to handle freight from a company which they considered unfair. This was exactly what the carriers had agreed their employees would not be required to do. If an employer may lawfully agree that its employees will not be required to handle freight from a struck company, and such a situation arises, it is hard to see how it can be said that, simply because the employees do what they have the right to do, there was a strike or refusal to work. Nor can it be said that there was a "forcing" or requiring of an employer to cease doing business with another person, because the employer was only being compelled to live up to its own voluntary contract entered into in advance of the happening.

It cannot be argued that the actions of Teamsters constituted a sympathy strike or an illegal boycott. The actions taken might have been so regarded had there been no hot cargo clause. In sympathy strikes or illegal boycotts the employers are innocent victims of disputes with which they are not concerned. But where such a clause exists a different situation arises. The secondary employer has consented, knowingly and in advance, to the refusal of its employees to handle goods of the original employer.

It seems to us that the purpose of Section 8(b) (4) (A) is to prevent injury to secondary employers in the disputes of others in which the secondary employers are not involved, and to prevent the forcing of such employers to stop doing business with a third person. But, in cases like this one, the secondary employer has agreed, as part of its bargaining contract with its own union, not to handle goods of an unfair employer; and it would

---

4. Rabouin v. National Labor Relations Board, 2 Cir., 1952, 195 F.2d 906, 912. There the court said: "The union cannot have committed an unfair labor practice under this section in regard to those employers who refused to handle Rabouin's shipments under the terms of the area agreement provision relating to cargo shipped by struck employers. Consent in advance to honor a hot cargo clause is not the product of the union's 'forcing or requiring any employer * * * to cease doing business with any other person.' § 8(b) (4) (A)." See also Meier & Pohlmann Furniture Co. v. Gibbons, 8 Cir., 1956, 233 F.2d 296; Id., D.C.1953, 113 F.Supp. 409; Madden v. Local 442, D.C.W.D.Wis.1953, 114 F.Supp. 932.

seem that Teamsters employed the only effective means in its power to enforce the agreement.

I am authorized to state that Circuit Judge Washington agrees with the foregoing treatment of No. 13,394. He is filing an additional statement.

Circuit Judge Prettyman dissents for reasons which he will state separately.

The Board's order as to Teamsters will be set aside.

## II

### Appeal in No. 13,406

### Petition of Local 850, International Association of Machinists

█ Machinists urge a number of objections to the Board's findings and order. Among them is that the Board erred in not holding that Teamsters' conduct was protected activity and, accordingly, Machinists' conduct in bringing the dispute to the knowledge of the members of the Teamsters' Union was not in violation of Section 8(b) (4) (A).

Machinists were not parties to the contract between the carriers and Teamsters. But they contend that, since Teamsters and the carriers were parties to a contract containing the hot cargo clause, an essential element to a finding of violation of the Act is missing. Their position is that the handling of American Iron freight (struck goods) by the employees of the carriers was taken out of the scope of their employment by the hot cargo clause and, therefore, Machinists could induce carrier employees to exercise their contract right not to handle struck goods. Machinists urge that, since Teamsters were free to honor Machinists' ambulatory picket line, their activity would not constitute encouragement or inducement of Teamsters to engage in a concerted refusal in the course of their employment to handle the goods of another employer.

We agree with the Trial Examiner and the Board majority that the conduct of Machinists must be evaluated independently of that of Teamsters and that the defenses available to Teamsters are not automatically available to Machinists. The latter are neither parties nor third party beneficiaries of the Teamsters-carrier contract.

The Trial Examiner and the Board majority found that after picketing of American Iron trucks began, while the trucks were on the premises of the carriers, dock employees of at least some of the carriers continued to handle American Iron products. Indeed, in some instances there were protests when supervisory employees attempted to move merchandise which would ordinarily be moved by the dock employees who were members of Teamsters. The Board found further that in most instances the dock employees continued to handle American Iron freight until instructed by representatives of their union not to do so.

Here, as above stated, Machinists had no connection with the contract containing the hot cargo clause and Teamsters' contract could not constitute the basis for a defense by Machinists.

█ We have examined the other contentions of Machinists, among them that the Board erred in not finding that the controversy was moot because the complaint was filed after the strike between Machinists and American Iron had been settled by execution of a new contract. A reading of the Act would indicate that a complaint may be filed where the party charged "has engaged in or is engaging" in unfair labor practices. There can be no doubt that orders dealing with unfair labor practices have preventive as well as remedial effects.

█ Machinists also contend that their picketing at the carriers' premises was legitimate primary activity aimed only at American Iron employees. This contention is foreclosed by the fact that the findings of the Board were based upon disputed facts; and there is substantial evidence to sustain the findings of the Board.

PRETTYMAN, Circuit Judge, concurs in the result in No. 13,406 but for differ-

ent reasons, which reasons he will state in a separate opinion.

WASHINGTON, Circuit Judge, dissents for reasons which he will state separately.

Order of Board in No. 13,394 set aside.
Order of Board in No. 13,406 affirmed.

PRETTYMAN, Circuit Judge (dissenting in part and concurring in part).

I dissent from Judge Bastian's opinion and proposed judgment in No. 13394, relating to the Teamsters. In a nutshell my view is that the hot cargo clause cannot be enforced by a strike, because such a strike or refusal to work is flatly forbidden by Section 8(b) (4) (A) of the Act.

A strike is a concerted refusal by employees to do work the employer wants done. This is the purport of the opinions on the point.[1] A refusal to work is likewise a declination directed at the employer. So, if an employer and his employees agree that certain work shall not be done, and it is therefore not done, there is no "strike" or "refusal to work". Section 8(b) (4) (A) forbids only "a strike or a concerted refusal in the course of their employment".

It follows from the foregoing that, if an employer and his employees agree by contract that the employees need not handle certain goods, and both abide by their agreement, there is no "strike" or "refusal to work". But, if an employer, having entered into such a contract, thereafter refuses to abide by his agreement and directs his employees to handle the goods, and his employees refuse to do so, there is a strike or refusal to work. Such a strike or refusal to work, where an object is to force the employer to cease transporting the products of another producer, is forbidden by the statute.

It may be that the right vouchsafed the employer by Section 8(b) (4) (A) cannot be nullified by contract. Section 7 rights cannot be contracted away.[2] And it can be argued that when Congress meant Section 8 rights to be subject to contract it said so, as it did in Section 8 (a) (3). But I need not reach that question, and, since the answer, one way or the other, involves such sweeping considerations, I do not undertake it. On the other hand it may be that the hot cargo clause is a valid contract agreement between the carriers and their employees and may validly be carried out by both parties. But even so, when a carrier refuses to comply with the contract, even though he is thereby violating the agreement, the Teamsters, his employees, may not strike or refuse to work in order to prevent the handling of the struck goods. I think the employees may not violate the statute in order to enforce their agreement with the carrier.[3]

The sum of it is that Section 8 situations can legally be avoided, by contract or otherwise. Employers and employees need not so conduct themselves as to give rise to Section 8 prohibitions. But the terms of the statute cannot be nullified, by contract or otherwise. And so employers and employees cannot agree that even if a situation covered by the statute does occur the statute shall not apply.

---

1. See Restatement, Torts § 797 (1939), and the many cases collected under "Strike" in Words and Phrases, especially in the pocket supplement.

2. National Licorice Co. v. National Labor Board, 309 U.S. 350, 60 S.Ct. 569, 84 L.Ed. 799 (1940). See also Bethlehem Steel Company, 89 N.L.R.B. 341 (1950).

3. Strong evidence of the public interest in the problem is afforded by the fact that the motor carrier which honors a hot cargo clause thereby violates duties owed the public, breaches other contracts, and may well be in violation of another public law, Part II of the Interstate Commerce Act, 49 Stat. 543 (1935), as amended, 49 U.S.C.A. § 301 et seq. See the Examiner's Decision in Galveston Truck Line Corp. v. ADA Motor Lines, I.C.C. No. MC–C–1922 (April, 1957), which involves actions of our appellant Teamsters, Local No. 886, and cooperating motor carriers.

I do not agree with the argument that the hot cargo clause has the effect of removing struck goods from "the course of their [the Teamsters'] employment". If such a construction could be placed upon the phrase in Section 8(b) (4) (A), careful contract draftsmanship could legalize without qualification any otherwise prohibited activity, e.g., the jurisdictional strike, the sympathy strike, and the wildcat strike, by artificially exempting the work involved from the course of the employment governed by the contract. I think the statute cannot thus be nullified.[4]

One of the carriers involved here adhered to its agreement and would not request its employees to handle the goods. Its employees did not strike. So in that particular case I would not affirm the cease and desist order. As to all the other carriers I would affirm as to the Teamsters.[5]

I concur in Judge Bastian's proposed judgment in No. 13406, relating to the Machinists. I also agree with his opinion in that regard, except that I add, since as I have pointed out I think the hot cargo clause could not be enforced by a strike, that it could not have been so enforced by the Machinists even if they had been parties to the contract.

WASHINGTON, Circuit Judge (concurring in Judge BASTIAN'S opinion in No. 13,394, and dissenting from the latter's opinion in No. 13,406).

In the General Drivers case, I think Judge Bastian is correct in his treatment of the "hot cargo" clause and its effect. That clause is bargained for, and must be presumed to be balanced by concessions which the employer has obtained at the bargaining table. To say that the employer is free in his discretion to recognize or ignore the clause, when a concrete problem comes up, seems to me to encourage lawlessness in industrial relations. Once a valid contract has been made—and contracts such as this have been recognized as valid by the Board and the Second Circuit—both sides are entitled to rely on the prompt and faithful execution of its provisions. I therefore agree that efforts by the Teamsters to induce their own members to abide by the terms of the "hot cargo" clause embodied in their collective bargaining agreement are not violative of Section 8(b) (4) (A).

The same reasoning impels me to the conclusion (in No. 13,406) that the efforts of the Machinists, directed toward the same end, are similarly outside the scope of the statutory proscription. It is true that the Machinists are not a party to the contract which contains the "hot cargo" clause, and not a third-party beneficiary of it. But this does not mean that the existence of the clause has no effect on the lawfulness of the Machinists' conduct. The clause is evidence of the advance consent of the trucking companies that their employees are to refrain from handling struck goods. Because the employers have given this consent and because no basis appears in the statute for permitting this consent to be revoked on an ad hoc basis, the efforts of the contracting union (the Teamsters) to induce employees of the trucking companies to comply with the clause are upheld. The reasoning must be that what is being induced is not a "strike or refusal to work" with an object of "forcing" or "requiring" an employer to cease doing business with another person within the meaning of Section 8(b) (4) (A). This being so, I cannot agree that what is being induced *is* within the meaning of the statute when the inducing is done by the primary employees, the Machin-

4. The Board's rejection of this argument on another ground, Sand Door & Plywood Co., 113 N.L.R.B. 1210, 1217 (1955), was cited with approval by the Sixth Circuit in National Labor Relations Board v. Local 11, United Brotherhood of Carpenters, 1957, 242 F.2d 932.

5. In National Labor Relations Board v. Local 1976, United Brotherhood of Carpenters, 241 F.2d 147 (1957), the Ninth Circuit reached the result suggested in this dissent. See also National Labor Relations Board v. Local 11, United Brotherhood of Carpenters, 6 Cir., 1957, 242 F.2d 932.

ists.. The operative effect of the employer's consent is, in my view, the same, regardless of who it is that reminds the secondary employees of the terms of their contract, and seeks to induce compliance with it.